# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DANDRE LOUIS LANE,

Defendant-Appellant.

FOR PUBLICATION
November 13, 2014
9:15 a.m.

No. 313818
Wayne Circuit Court
LC No. 12-005207-FC

Before: WHITBECK, P.J., and FITZGERALD and MURRAY, JJ.

PER CURIAM.

Defendant, D'Andre Louis Lane, appeals as of right his convictions, following a jury trial, of first-degree felony murder[1] and first-degree child abuse.[2] The trial court sentenced Lane to serve terms of life imprisonment for his murder conviction and 11 to 30 years' imprisonment for his child abuse conviction. We affirm.

## I. FACTS

### A. BACKGROUND FACTS

Lane was the father of Bianca Jones, who was two years old when she disappeared. In 2011, Bianca primarily lived with her mother Banika Jones, her grandmother Lilia Jones Weaver, her uncle Gerry Weaver, and Mary Ford-Gandy on Custer Street in Detroit. Lane, Anjali Lyons, Bianca's seven-year-old sister, and Bianca's two-year-old sister lived with Lisa Dungey on Mitchell Street in Detroit.

Jones testified that after Bianca was born, Lane often visited her. In late 2011, Lane agreed to help Jones with child care by taking temporary custody of Bianca. Jones testified that Lane was glad that Bianca would be able to spend some time with her sisters. According to Jones, Lane picked Bianca up on November 26, 2011. At that time, he was driving Dungey's

---

[1] MCL 750.316(1)(b).

[2] MCL 750.136b(2).

silver Grand Marquis because his car was broken down. Lane was going to keep Bianca until before Christmas, and Bianca would share a bed with her two-year-old sister.

Lyons testified that Lane was responsible for child discipline in the house. Dungey testified that Lane used time-outs, but testified that Lane hit the children with a home-made paddle, fashioned from a wooden stick with a duct tape-covered sponge on one. According to Lyons, Lane kept the paddle in a linen closet down the hall from the children's room. The closet door squeaked when it was opened. Lyons could not recall if Lane ever used the paddle on Bianca, but the seven-year-old testified that Lane had used the paddle to give Bianca "a whooping."

Jones testified that Bianca was almost toilet-trained, but still had accidents and wore pull-ups at night. Jones did not pack any pull-ups for Bianca when Lane picked Bianca up. Lyons testified that if Bianca or the two-year-old had an accident at night, Lane would ask them questions, spank them, and give them a time-out.

According to Lyons, between November 26 and December 2, 2011, Bianca had diarrhea and more than one accident. At trial, Lyons testified that she did not remember how Lane reacted to Bianca's accidents. Lyons's preliminary examination testimony was admitted as substantive evidence. At her preliminary examination, Lyons testified that Lane became angry, frustrated, and irritated, and was "more upset" the second time that Bianca had an accident.

Clinton Nevers testified that he worked out in Lane's basement every morning. According to Nevers, on November 29, 2011, he was sitting in Lane's living room after working out. He heard "three hard paddles" and a baby begin to cry. Nevers went to investigate and Lane met him in the doorway of a bedroom where Bianca was crying. Lane told him that Bianca had urinated and defecated on his floor and "he don't play that s***."

According to Dungey, she picked Lyons up from work on December 1, 2011. She also picked up the seven-year-old and Lane's teenage nephew, and dropped them off at her house. She did not return until the following morning. Lyons testified that she put the children to bed around 10:30 p.m., sat with Lane and Lane's nephew for an hour, and then went to bed.

According to Lyons, the sound of Bianca crying woke her during the night. She heard "a couple taps" from the downstairs bathroom and a toilet flushing. Lyons heard Lane ask Bianca about wetting the bed, heard the closet door open, and heard Lane hitting Bianca with the paddle. Lyons did not get up to investigate. Lyons testified that, in response to an investigative subpoena, she had stated that she heard four or five smacking sounds and that Bianca was crying "like she was really intensely in pain."

In a video interview with police that was played for the jury, Lane stated that Bianca had a little diarrhea that night and did not sleep well. According to Lane, at some time around 1:00 a.m., Bianca fell out of bed while getting up to go to the bathroom and hit her head on the floor. Lane took her to the bathroom, then kept her awake for a few hours in case she had a concussion.

Lane's nephew testified that he spent the night at Dungey's house and that he and Lane stayed up until 3:00 or 4:00 a.m. According to the nephew, Bianca soiled herself in her sleep and Lane brought her out to the living room. Lane tried to keep Bianca awake by "standin' her

up" and "tapp[ing] her with the paddle" on the buttocks. The nephew testified that Bianca was not crying and that Lane eventually put Bianca back to bed.

Lyons and Dungey both testified that Lane usually drove the seven-year-old to school while Bianca and the two-year-old stayed home, and neither could recall Lane ever taking Bianca along on the ride. Lane took Bianca out to the car with him on December 2, 2011.

According to Lane, he woke at around 6:45 a.m. and took Bianca and the two-year-old to the bathroom. Bianca seemed tired and "out of it a little bit." Lane's nephew testified that Lane brought Bianca into the living room before they left and sat her on the couch. Bianca was "[j]ust looking." The seven-year-old testified that she could not remember if she saw Bianca moving that morning. The seven-year-old testified that she told the truth when she previously said that she did not see Bianca up, moving, talking, walking, or standing on her own.

Lane's nephew testified that Lane put a blanket over Bianca's head when he carried her to the car. According to Lane, he draped a blanket over Bianca's head when he took her outside because it was cold. He removed the blanket from Bianca's head when he put her in the car, but she went back to sleep, so he covered her back up. Lane's nephew testified that Bianca's eyes were open in the car and she was "just looking" and did not make any noises.

Rico Blackwell, a friend of Lane, testified that he was walking to Wayne Community College on the morning of December 2, 2011. According to Blackwell, he heard Lane call his name and Lane pulled up to him in "a nice white vehicle." Lane was the only person in the vehicle, and Blackwell saw bags in the back seat. Blackwell and Lane spoke briefly, and Blackwell told Lane that he was late to class. Blackwell gave Lane his phone number, and Lane called him briefly so that Lane's phone number registered in Blackwell's phone. Lane looked "distraught" and did not offer Blackwell a ride to school. According to FBI Agent Christopher Hess, cell phone towers showed that Lane's phone placed a 14- to 18-second call to Blackwell at 8:55 a.m.

According to Dungey, Lane called her briefly to mention that he was going to Banika Jones's house to pick up more clothes for Bianca. Some time after that, Lane called back, crying and saying that someone took Bianca. Lyons testified that she could hear Lane screaming on Dungey's phone. Dungey testified that she heard a woman take Lane's phone. The woman said that someone took Bianca, that she was going to call the police, and hung up.

According to Ford-Gandy, who lived with Jones, she was still in bed when someone began banging on her door and yelling outside. It was between 9:00 and 9:15 a.m. Ford-Gandy heard a loud crash that sounded like someone "was busting down the door." Weaver testified that when he went downstairs, Lane was in the living room. According to Weaver, Lane was sobbing uncontrollably and kept saying "they got her[.]" Weaver could not make sense of what Lane was saying, but Lane eventually said that he had been carjacked by people with guns.

Weaver assumed that Lane had called the police and called Lilia Jones Weaver, Bianca's grandmother. According to cell phone records, Lane called Dungey at 9:40 a.m. Ford-Gandy testified that, after Lane admitted he had not called the police, she used his phone to call the police. Lane's cell phone records indicated that the 911 call was placed at 9:47 a.m.

-3-

Detroit Police Officer Patrick Lane testified that he arrived at Lane's house within five minutes of the 911 call. According to Officer Lane, Lane was very "shaken up" and it took a while for him to respond to any questions. Lane eventually stated that he had been driving "a black Crown Vic." When Officer Lane asked Lane where the carjacking occurred, Lane pointed to the corner of Custer and Brush.

In his recorded interview, Lane stated that he ran into Blackwell on Howard Street. Then he went along Woodward to Warren, turned right, took Warren to Brush, turned left, and headed south on Brush to Grand Boulevard. On Grand Boulevard, he stopped at a stop sign and someone behind him was honking at him. The other car was small, red, and had square headlights. Someone in the other car said that his lights were out, so he left his car to see if they were out. At that point, the front seat passenger got out of the other car holding a gun, jumped into Dungey's car, and drove off.

Detroit Police Officer Richard Arslanian testified that he heard a broadcast that a "black Mercury" with a child in the backseat was carjacked, and he began looking for the vehicle in the area of Brush, Custer, and Philadelphia streets. At 10:15 a.m., Officer Arslanian found Dungey's car in an alley. According to Officer Arslanian, the car's door was open, the car had its keys in the ignition and was running, and there was a child's car seat on the backseat that was covered by a blanket. The car was about half a mile from Custer.

Detroit Police Officer David LeValley testified that he thought it was "significant" that Bianca was not in the car. According to Officer LeValley, on the basis of his familiarity with crime reports, he would have expected the carjacker to leave the child in the vehicle. LeValley testified about extensive efforts by police and the community to locate Bianca, but Bianca was never found.

Agent Hess testified that he reviewed Lane's cell phone records. Lane's 8:55 a.m. call to Blackwell was not consistent with Lane being on Brush at that time because the area the call came from was four blocks west of Brush, on an area of the I-75 service drive near I-94.

Agent Hess testified that he took Lane on a "ride-along" on December 9, 2011. On the ride-along, Lane stated that he ran into Blackwell at the corner of Lafayette and Cass. Then he took Lafayette to Griswold, turned left, took Griswold to Grand River, turned right, took Grand River to Woodward, and turned left. According to Hess, Lane's body language during the ride-along was "significant." Lane "would not look to the left" when they passed the alley where Officer Arslanian found Dungey's car. Lane also got "worked up" when Hess drove along St. Aubin, east of I-75: he began breathing faster and shallower and started covering his face more than he had previously.

Andrea Halverson, an expert in DNA and forensic science, testified that she tested a DNA sample from the paddle. She excluded Jones and Dungey as contributors to the sample, but could not exclude Bianca or Lane. Halverson also tested a blood sample from a pillow, which matched Bianca's DNA profile.

At trial, FBI Canine Program Manager Rex Stockham testified as an expert in forensic canine operation. Stockham testified about the process of training and testing victim recovery

dogs. Stockham's protocol called for regular single- and double-blind testing of dogs throughout their working lives. Stockham's program had three full-time handlers in its program, including Martin Grime. Stockham testified that he had tested Morse and Keela, Grime's dogs, and that both dogs had accuracy ratings in the high 90 percent range. Stockham testified that dogs have been able to smell the odor of decomposition as soon as 2 hours after a victim's death, or years after a victim's burial.

Grime testified as an expert in the training and employment of cadaver dogs. According to Grime, he is a full-time contractor for the FBI. Grime worked with Morse, a dog "trained to search for and detect the odor of decomposing human remains," and Keela, "trained to search for and locate specifically human blood." Grime testified that there was no methodology to test the dogs' responses when there is no recoverable material, and that the odor of decomposition may transfer if a person touches a dead body and then touches something else.

According to Grime, on December 4, 2011, he took his dogs to an enclosed warehouse that contained 31 vehicles. Grime was told that Bianca was in one of the vehicles at the time of the carjacking, but was not told which vehicle was involved. Morse alerted Grime to the presence of the odor of decomposition in the back seat and trunk of a silver Grand Marquis. Keela later screened the car and did not alert Grime to the presence of human blood.

Grime testified that, after the vehicle screening, he took the dogs to an administrative building to screen the items removed from Dungey's car. Grime did not know where the objects were located in the building, and the objects had been placed in a room filled with "all sorts of things." Morse alerted Grime to the odor of decomposition in Bianca's car seat and a bag containing Bianca's blanket. Grime later took the dogs to Dungey's house. Morse alerted him to the odor of decomposition in a room that contained bunk beds and a closet without a door.

## B. EVIDENTIARY HEARING

Before trial, Lane moved to exclude the cadaver dog evidence, contending in part that it was not admissible under MRE 702. At the evidentiary hearing, Stockham testified that he had started a science-based victim recovery dog program for the FBI. The program's protocol called for regular single- and double-blind testing of the dogs throughout their working lives. Stockham's program had three full-time dog handlers in its program, including Grime.

Stockham testified that Grime was a recognized expert in the field of animal behavior in the United Kingdom who worked with and trained Morse and Keela. Stockham tested Grime and Morse in 2011. On one occasion, Morse gave a "nonproductive response" when he "barked in a blank room." No samples were in the room, but Stockham could not exclude the possibility that trace matter was there.

According to Stockham, no instruments can detect and confirm the presence of human remains. It is not clear whether a dog reacts to single compound or a combination of compounds in a decomposing body. Therefore, nonproductive responses cannot be verified as correct or incorrect. Instead, Stockham assumes that the result is correct if the dog has routinely passed testing before and after the incident. Grime admitted that there was no scientific testing method that could corroborate Morse's responses in this case.

Grime submitted Morse and Keela's training reports into evidence. Over the course of 49 tests, Morse gave no false negative or false positive responses to tests in controlled environments. He gave one "unexplained" response, which was a single bark in a "blank" room. Morse scored 100 percent in tests on December 2 and December 6, 2011. Morse was tested on variety of dates between January 21, 2011, and February 13, 2013. Morse scored 100 percent in all but one test, on which he scored 95 to 100 percent. Morse did not give false positive responses to animal remains during his tests.

Following the evidentiary hearing, the trial court denied Lane's motion to exclude the cadaver dog evidence. At trial, the trial court instructed the jury to consider the cadaver dog evidence carefully and not to convict Lane solely on the basis of that evidence.

## II. CADAVER DOG EVIDENCE

### A. STANDARD OF REVIEW

This Court reviews for an abuse of discretion the trial court's decision to admit or exclude evidence.[3] The trial court abuses its discretion when its decision falls outside the range of principled outcomes,[4] or when it erroneously interprets or applies the law.[5] We review de novo the preliminary questions of law surrounding the admission of evidence, such as whether a rule of evidence bars admitting it.[6]

### B. ADMISSIBILITY OF EXPERT OPINION

#### 1. LEGAL STANDARDS

MRE 702 permits the trial court to admit expert opinion testimony on areas of specialized knowledge:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[3] *People v Hine,* 467 Mich 242, 250; 650 NW2d 659 (2002).

[4] *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

[5] *People v Giovannini*, 271 Mich App 409, 417; 722 NW2d 237 (2006).

[6] *People v Layher*, 464 Mich 756, 761; 631 NW2d 281 (2001).

"[T]he court may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability."[7]  The *Davis-Frye*[8] test examines the reliability of the evidence.[9]  The purpose of this test is to "ensure that a jury is not relying on unproven and ultimately unsound scientific methods."[10]

## 2.  APPLYING THE STANDARDS

Lane contends that the trial court erred when it admitted the cadaver dog evidence in this case because the testimony was not the product of reliable principles or methods.  We disagree.

Michigan courts have applied the *Davis-Frye* test to the admissibility of tracking dog evidence.  In *People v Riemersma*, this Court considered whether tracking dog evidence was admissible.[11]  In *Riemersma*, the dog's handler testified about the dog's reliability during testing and in prior investigations.[12]  Additionally, circumstantial evidence corroborated the dog's identification.[13]  This Court concluded that, under those circumstances, the tracking dog evidence was admissible.[14]

The *Riermersma* Court relied on this Court's previous holding in *People v Norwood* regarding the necessary foundation to establish that tracking dog evidence is reliable.[15]  In *Norwood*, this Court held that tracking dog evidence is sufficiently reliable if the proponent of the evidence shows four things:

> (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it.[16]

---

[7] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). See *People v Beckley,* 434 Mich 691, 718-719; 456 NW2d 391 (1990).

[8] *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States,* 293 F 1013 (DC Cir, 1923).

[9] *Beckley*, 434 Mich at 719.

[10] *Id*.

[11] *People v Riemersma*, 104 Mich App 773; 306 NW2d 340 (1981).

[12] *Id*. at 782.

[13] *Id*.

[14] *Id*.

[15] *Id*. at 781-792.

[16] *People v Harper*, 43 Mich App 500, 508; 204 NW2d 263 (1972).  See *People v Norwood*, 70 Mich App 53, 55; 245 NW2d 170 (1973).

We reject Lane's argument that, because chemical evidence cannot corroborate whether there was decomposition at the locations Morse identified in this case, the evidence must be excluded as unreliable. Clearly, the four-part test adopted by this Court to ensure the reliability of *tracking* dog evidence does not exactly correlate to the use of *cadaver* dogs. However, cadaver dog evidence is not significantly different from other forms of tracking dog evidence. Tracking dogs and cadaver dogs both use a precise sense of smell to identify scents that are outside the range of human ability to detect. Scientific devices can no more follow the scent left on a piece of discarded clothing from the scene of a robbery to a person's home than they can identify the smell of decomposing human remains. Just as it is not a reason to exclude all tracking dog evidence, the lack of scientific verification of the presence of a specific scent is not a reason to exclude cadaver dog evidence in a blanket fashion. We conclude that the trial court must instead consider the reliability of the cadaver dog evidence in each case.

We also conclude that the trial court did not err by applying the tracking dog test to cadaver dog evidence. Essentially, the trial court in this case applied the foundational requirements of *Norwood* to another form of dog-based evidence. Here, the trial court determined that Grime and Stockham were "more than qualified," that they had employed sufficient training methods, and that circumstantial evidence supported Morse's identification of the car, car seat, and blanket because Morse identified those items when neither Morse nor Grime had any prior knowledge that those items were involved in this case. While the trial court did not specifically determine that the evidence was not stale, Grime's dogs tested the evidence on December 4, 2011, a mere two days after Bianca's disappearance on December 2, 2011, and there was no evidence that the car, car seat, or blanket were contaminated with human remains.

In sum, we conclude that cadaver dog evidence is sufficiently reliable if the proponent of the evidence establishes the foundation that (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in identifying human remains; (3) circumstantial evidence corroborates the dog's identification; and, (4) the evidence was not so stale or contaminated as to be beyond the dog's competency to identify it. We conclude that, here, the trial court correctly ruled that the prosecutor provided a sufficient foundation to admit the cadaver dog evidence in this case. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the evidence under MRE 702.

## C. RELEVANCE

### 1. LEGAL STANDARDS

The trial court may only admit relevant evidence.[17] Relevant evidence is evidence that has any tendency to make a fact of consequence more or less probable.[18] But even when evidence is relevant, the trial court may not admit it if the danger of its prejudicial effect

---

[17] MRE 402.

[18] MRE 401.

substantially outweighs its probative value.[19]  The prejudicial effect of the evidence substantially outweighs its probative value when evidence is only marginally probative, but the trier of fact may give the evidence undue or preemptive weight.[20]

Evidence is probative if it has *any* tendency to make a fact of consequence more or less probable.[21]  Unfair prejudice occurs if use of the evidence would be inequitable or if there is a danger that the jury will give it undue or preemptive weight.[22]

## 2.  APPLYING THE STANDARDS

Lane contends that the trial court erred because (1) the evidence was uncorroborated and thus not probative, and (2) the evidence was unfairly prejudicial because it invited the jury to rely on the infallibility of the dog.  We disagree.

The killing of a human being is an element of murder.[23]  Because Bianca's body was never recovered and Lane alleged that she was kidnapped, the fact of Bianca's death was in contention.  The reaction of a cadaver dog to the child's car seat, blanket, and bedroom certainly makes the fact of Bianca's death more likely to be true.

As discussed above, it is not necessary to have a machine confirm the presence of the odor of decomposition to admit the cadaver dog evidence.  In tracking dog cases, this Court has concluded that evidence is corroborated when circumstantial evidence also supports the reliability of the dog.[24]  Here, circumstantial evidence supported the dog's reliability.  Morse identified Dungey's car and items associated with Bianca without Morse or Grime knowing that those items were involved in Bianca's disappearance.  Further, the seven-year-old testified that Bianca did not walk, talk, move, or speak on the morning of her disappearance, witnesses testified that Lane took Bianca to his car with a blanket over her head, and Lane's nephew testified that Bianca was "[j]ust looking" while she was on the couch and in the car.  We conclude that the evidence was probative in this case.

We also disagree with Lane's contention that it was highly likely that the jury would give the cadaver dog evidence presumptive weight.  The record simply does not support Lane's assertions that Grime and Stockham testified that the dogs were infallible.  Rather, Stockham testified that the dogs' accuracy was in the high 90 percent range, and Grime specifically

---

[19] MRE 403.

[20] *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998); *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

[21] *Crawford*, 458 Mich at 389-390.

[22] *Blackston*, 481 Mich at 462.

[23] See *People v Nowack,* 462 Mich 392, 401; 614 NW2d 78 (2000).

[24] See *Riemersma*, 104 Mich App at 781 (the defendant's boot print matched a boot print in the snow of a robbery).

testified that he would not say that the dogs were perfect. The trial court also instructed the jury that it could not convict Lane solely on the basis of the cadaver dog evidence. This Court presumes that jurors follow their instructions.[25] We conclude that the trial court did not err by admitting irrelevant evidence.

## III. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

A claim that the evidence was insufficient to convict a defendant invokes that defendant's constitutional right to due process of law.[26] This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction.[27] We review the evidence in a light most favorable to the prosecutor to determine whether a rational trier of fact could find that the prosecutor proved the crime's elements beyond a reasonable doubt.[28]

### B. LEGAL STANDARDS

"A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child."[29] Serious physical harm is "any physical injury to a child that seriously impairs the child's health or physical well-being . . . ."[30]

The elements of felony murder are (1) the killing of a person, (2) with intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of an enumerated felony.[31] First-degree child abuse is an enumerated felony.[32] The presence of the victim's body is not necessary to establish that a

---

[25] *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008

[26] *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992); *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970).

[27] *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

[28] *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

[29] MCL 750.136b(2).

[30] MCL 750.136b(1)(f).

[31] *Nowack*, 462 Mich at 401 (quotation marks and citations omitted).

[32] MCL 750.316(1)(b).

person was killed.[33]  Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to prove the elements of a crime.[34]

### C.  APPLYING THE STANDARDS

Lane contends that, because Bianca's body was never found and there was no physical evidence that she was dead or injured, there was no evidence that Bianca suffered a physical injury or death.  We disagree.

We conclude that this case is distinguishable from *People v Fisher*.  In *People v Fisher*, a panel of this Court held that the prosecutor fails to present sufficient evidence that a person was killed when the prosecutor did not present evidence of an act that resulted in death.[35]  In *Fisher*, the defendant had physically abused his wife and threatened to kill her.[36]  The defendant's wife filed for divorce, and she was last seen in the defendant's company.  The defendant told investigators that he had dropped his wife off at her car.[37]

This Court held that the evidence was not sufficient to prove that the defendant committed an act that resulted in his wife's death.[38]  This Court reasoned that, while inferences may support the elements of a crime, inferences may not be based solely on speculation.[39]  A complete absence of physical or circumstantial evidence showing that a person is dead is not sufficient to establish the inference that a missing person was killed.[40]

Here, there was circumstantial evidence from which the jury could conclude that Bianca is dead and that Lane both physically injured and killed her.  The prosecutor presented evidence that Lane punished Bianca for toilet training incidents by hitting her with a paddle, that he was getting more frustrated with Bianca's toilet training accidents, and that on the morning of December 2, 2011, he hit Bianca and she cried as if she was "intensely in pain."  Bianca's seven-year-old sister did not see Bianca talking, walking, or moving the next morning.  Bianca's eyes were open, but she was "just looking."  Lane carried her outside to Dungey's car with a blanket over her head.  When Blackwell spoke with Lane later that morning, Lane was the only person in the car.  When Lane told police that he was carjacked, he told them that he was driving a black Crown Victoria rather than a silver Grand Marquis.  Lane gave inconsistent statements about where he drove that morning.  Morse alerted Grime to the odor of decomposition on Dungey's

---

[33] *People v Fisher*, 193 Mich App 284, 287; 483 NW2d 452 (1992).

[34] *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

[35] *Fisher*, 193 Mich App at 287.

[36] *Id*. at 286.

[37] *Id*.

[38] *Id*. at 287.

[39] *Id*. at 289.

[40] *Id*. at 288-289.

car, Bianca's car seat, and Bianca's blanket. Morse also alerted Grime to the odor of decomposition in Bianca's room, and police discovered blood on Bianca's pillow.

We conclude that, viewing this evidence in the light most favorable to the prosecutor, a rational finder of fact could find that Lane physically injured Bianca in the early morning of December 2, 2011, and that the injury seriously impaired Bianca's health. A rational finder of fact could also find that Lane's actions resulted in Bianca's death. Accordingly, we conclude that sufficient evidence supported Lane's convictions.

IV. MISTRIAL

A. STANDARD OF REVIEW

This Court reviews for an abuse of discretion the trial court's decision to deny a defendant's motion for a new trial.[41] The trial court abuses its discretion when its decision falls outside the range of principled outcomes.[42]

B. LEGAL STANDARDS

The trial court should only grant a mistrial for "an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial,"[43] and when "the prejudicial effect of the error cannot be removed in any other way."[44] The trial court may consider, among other things, whether the prosecutor intentionally presented the information to the jury or emphasized the information.[45]

C. APPLYING THE STANDARDS

Lane contends that the trial court abused its discretion when it denied his motion for a mistrial after the prosecutor admitted an unredacted interview into evidence, contrary to the prosecutor and Lane's pretrial agreement to redact any information related to Lane's former criminal history and gang affiliation. We disagree.

The prosecutor submitted into evidence Lane's interview with two officers, Julius Moses and John Quincy, on December 3, 2011. The recorded interview was about four hours long. Before playing the recorded interview, the prosecutor indicated that the recording had been redacted and defense counsel indicated that the recording was "redacted and approved by the

---

[41] *People v Waclawski,* 286 Mich App 634, 708; 780 NW2d 321 (2009).

[42] *Babcock*, 469 Mich at 269.

[43] *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010), quoting *People v Haywood*, 209 Mich App 217, 228; 530 NW2d. 497 (1995).

[44] *People v Horn*, 279 Mich App 31, 36; 755 NW2d 212 (2008).

[45] *Id*.; *People v Griffin*, 235 Mich App 27, 36; 597 NW2d 176 (1999).

defense." The audio portion of the recording was deleted, but the closed captioning was not. During the interview, officers asked Lane if he used to be in a gang. Lane replied, "It was a long time ago . . . back when I was 15." Lane also stated that he was caught and served two years in a juvenile detention facility.

Defense counsel challenged the information during the playing of the recording, and later moved for a mistrial. The prosecutor agreed that the information should have been redacted and stated, "I don't know what happened." The trial court denied defense counsel's motion, concluding that the information was on the screen only seconds, and that it could be remedied with a curative instruction.

Lane contends on appeal that the error was clearly intentional. We disagree. Lane did not raise this argument below and the trial court did not find that the prosecutor's error was intentional. Instead, after considering the circumstances and nature of the information, the trial court concluded that the error was not so prejudicial that a jury instruction could not cure it. The record does not support Lane's assertion that the prosecutor intentionally admitted the evidence. We conclude that the trial court's decision did not fall outside the principled range of outcomes.

## V. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

This Court will not reverse a conviction on the basis of prosecutorial misconduct unless the defendant "timely and specifically" challenges the alleged misconduct before the trial court, or unless a failure to review the issue would result in the miscarriage of justice.[46] We review unpreserved claims of prosecutorial misconduct for plain error.[47] We will not find error requiring reversal if a curative instruction could have alleviated the effect of the prosecutor's misconduct.[48]

### B. LEGAL STANDARDS

The prosecutor has committed misconduct if the prosecutor abandoned his or her responsibility to seek justice and, in doing so, denied the defendant a fair and impartial trial.[49] A prosecutor can deny a defendant his or her right to a fair trial by making improper remarks that "so infect[] the trial with unfairness as to make the resulting conviction a denial of due

---

[46] *Unger*, 278 Mich App at 234-235.

[47] *Id*. at 235.

[48] *Id*.

[49] *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007); *People v Jones*, 468 Mich 345, 353; 662 NW2d 376 (2003).

process."[50]  We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's comments in context and in light of the defendant's arguments.[51]

## C.  APPLYING THE STANDARDS

### 1.  LANE'S VERACITY AND GUILT

Lane contends that the prosecutor committed misconduct when she argued in her opening and closing statements that Lane's explanation for Bianca's disappearance was untrue.  Lane also contends that the prosecutor stated her belief that Lane was guilty.  Reading the prosecutor's statements in context, we disagree.

During opening statements, a prosecutor may "state the facts that will be proved at trial."[52]  A prosecutor may not offer his or her personal belief about the defendant's guilt, but may summarize what he or she thinks the evidence will show.[53]  During closing statements, a prosecutor may argue all the facts in evidence and all reasonable inferences arising from them, as they relate to the prosecutor's theory of the case.[54]

Here, the prosecutor stated the following during her opening:

> At around 9:00 a.m., the defendant claims he was car-jacked.  He claims that the car-jackers took the car with Bianca inside and just drove off.
>
> * * *
>
> After the car-jacking, the defendant was left with his cellphone.  He claims that he called Lisa Dungey, and ran to the Custer home, the home where he was right near, for help.
>
> This is where the defendant's car-jacking story goes from implausible and unlikely to unequivocally false.
>
> The evidence will show that in fact the defendant was on the east side of Detroit at 8:55 that morning.  He did not call Lisa Dungey until 9:40.  The defendant, himself, never called 911.  The defendant has never accounted for his whereabouts between 8:55 a.m., and 9:40 a.m., when he called Lisa Dungey.

---

[50] *Donnelly v DeChristoforo*, 416 US 637, 643; 94 S Ct 1868; 40 L Ed 2d 431 (1974).  See *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995).

[51] *Dobek*, 274 Mich App at 64.

[52] *Id*. at 192.

[53] *People v Ericksen*, 288 Mich App 192, 200; 793 NW2d 120 (2010).

[54] *Bahoda*, 448 Mich at 282; *Unger*, 278 Mich App at 236.

\* \* \*

He even lies about the color of the car, telling the police that it was black, when it was, in fact, a light silver gray.

\* \* \*

The defendant would have you believe that two car-jackers turned from car-jackers to child abductors, in a six block ride, and decided they didn't want the car, but took the baby from beneath the blanket, and then spread out the blanket and took off somewhere. Eventually, as the investigation continued, the evidence compounded to show that the defendant's story was not only implausible, but it was a complete lie.

During closing, the prosecutor concluded by stating, "When you think about all of that, that will lead you to one primary conclusion, and that is that the defendant is guilty. The defendant is guilty." And, after defense counsel argued that Lane was confused during his ride-along with Agent Hess, the prosecutor argued in rebuttal:

Mr. Lane is confused? What is he confused about? Because he can't keep all his lies straight. That's why he's confused.

When he's standing out there, and he's trying to remember where he was, and what he did, I bet it's real confusing, when you killed your baby, and the FBI is on to you, and you're trying to figure out how to clean it all up. It would be confusing, wouldn't it?

But I bet you what wouldn't be confusing: if somebody kidnapped your baby and stole your baby from your arms. You would remember every moment, every turn, everything you saw. That would be imprinted in your mind, forever. You'd never forget it. It wouldn't be confusing. He's confused because he's lying, and he can't keep all his lies straight.

Reviewing the prosecutor's statements in context, we conclude that they do not constitute plain error. In her opening statement, the prosecutor did not offer an opinion about Lane's guilt. Rather, the prosecutor summarized what she believed that the evidence would show. Similarly, the prosecutor's closing statements were arguments about the evidence and inferences arising from it as they related to the prosecutor's statement of the case. The prosecutor did not state her personal opinion of Lane's guilt or veracity, but rather indicated that the evidence showed that Lane had lied to the police and was guilty. Finally, the trial court instructed the jury that the attorneys' statements were not evidence and that they should draw their own conclusions. There is no indication that the trial court's instruction failed to remove any possible prejudice from these remarks.

On these bases, we conclude that Lane has not shown plain error in the prosecutor's remarks, or shown that any error affected his substantial rights.

## 2.  CIVIC DUTY

Lane next contends that the prosecutor made an improper civic duty argument in her closing statement.  Again, we disagree.

The prosecutor may not inject issues into a trial that are broader than the defendant's guilt or innocence.[55]  The prosecutor commits misconduct when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civil duty.[56]

Here, during her closing argument, the prosecutor argued that

just because you can successfully dispose of a body does not mean you should get away with murder.  We can't bring her body back.  We can ask you for a measure of justice for Bianca.

He wants you to buy the story that he tried selling to the police.  He wants you to buy it, despite the fact that it's completely illogical and defies common sense. . . .

We, ladies and gentlemen, are asking you to stand up for justice for Bianca.  We are asking you to apply your common sense and logic to this evidence.  Find him guilty.  The evidence has proven his guilt, beyond a reasonable doubt.

Reviewing the prosecutor's statements in context, we conclude that the prosecutor did not inject issues broader than Lane's guilt into the trial.  The prosecutor did not urge the jury to suspend its powers of judgment and find Lane guilty on the basis of civic duty or sympathy.  Rather, the prosecutor urged the jury to find Lane guilty on the basis of the evidence and its sense of judgment, and, as a result, Bianca would have justice.  Accordingly, Lane has not shown plain error.  And, again, the trial court instructed the jury to determine Lane's guilt on the basis of the evidence admitted at trial.

We conclude that Lane has not shown that the prosecutor's statements constituted a plain error that affected his substantial right.

## 3.  FACTS NOT IN EVIDENCE

Lane contends that the prosecutor argued facts not in evidence when she argued that Bianca was dead even though her eyes were open. We disagree.

---

[55] *People v Cooper,* 236 Mich App 643, 650-651; 601 NW2d 409 (1999).

[56] *Unger*, 278 Mich App at 237; *People v McGhee,* 268 Mich App 600, 636; 709 NW2d 595 (2005).

The prosecutor may not make a statement of fact that is unsupported by the evidence.[57] But the prosecutor may argue reasonable inferences arising from the evidence as the inferences relate to the prosecutor's theory of the case.[58]

We disagree with Lane's contention that the prosecutor argued *facts* not in evidence. Here, the prosecutor contended that Lane's nephew testified that Bianca's eyes were open on the morning of December 2, 2011, but "eyes can be open when you're dead. They can be fixed and dialated [sic]." It is clear that the prosecutor was offering the *theory* that Bianca's eyes could have been open even though she was dead. And, again, the trial court instructed the jury that the arguments were not evidence. We conclude that Lane has not established that the prosecutor's argument constituted plain error that effected Lane's substantial rights.

## VI.  INEFFECTIVE ASSISTANCE

### A.  STANDARD OF REVIEW

A criminal defendant has the fundamental right to effective assistance of counsel.[59]  A defendant's ineffective assistance of counsel claim "is a mixed question of fact and constitutional law."[60]  Generally this Court reviews for clear error the trial court's findings of fact, and reviews de novo questions of law.[61]  But a defendant must move the trial court for a new trial or evidentiary hearing to preserve the defendant's claim that his counsel was ineffective.[62]  When the trial court has not conducted a hearing to determine whether a defendant's counsel was ineffective, our review is limited to mistakes apparent from the record.[63]

### B.  LEGAL STANDARDS

To prove that his defense counsel was not effective, the defendant must show that (1) defense counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that counsel's deficient performance prejudiced the defendant.[64]  We

---

[57] *People v Schultz*, 246 Mich App 695, 710; 635 NW2d 491 (2001).

[58] *Bahoda*, 448 Mich at 282; *Unger*, 278 Mich App at 236.

[59] US Const, Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

[60] *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

[61] *Id*.

[62] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973); *Unger*, 278 Mich App at 242.

[63] *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003); *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012).

[64] *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994).

must presume that counsel provided effective assistance.[65] A defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different.[66]

Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant.[67] MRE 607 provides that any party may attack the credibility of a witness. MRE 608 provides that "[s]pecific instances of the conduct of a witness, for the purposes of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence." But MRE 608 does allow a party to inquire into specific instances of conduct "if probative of truthfulness or untruthfulness[.]"

## C. APPLYING THE STANDARDS

Lane contends that defense counsel provided ineffective assistance when he failed to impeach Grime with evidence that one of his cadaver dogs, Eddie, in 2009 had alerted to the odor of decomposition on what was determined to be a piece of coconut shell. We disagree.

The basis of Lane's claim is that counsel was ineffective for failing to admit certain impeachment evidence. Lane contends that Grime testified that his dogs are 100 percent accurate, and that counsel should have impeached Grime with the evidence involving Eddie. Lane bases his argument on a factual predicate that the record does not support.

The defendant must show the factual predicates of his or her claims on appeal.[68] Here, Grime testified that Morse's proficiency test results were "very high" and that, during specific training dates before and after December 4, 2011, Morse tested 100 percent positive and with 100 percent efficiency. However, Grime did not testify that "his dogs" were 100 percent accurate or flawless. To the contrary, when asked whether Morse was "pretty much perfect," Grime testified that he "wouldn't say that," and that his dogs were not 100 percent correct.

Because Grime never testified that his dogs were 100 percent accurate, evidence of a specific instance in which one of Grime's dogs was inaccurate was not probative of Grime's truthfulness and would not have been valid impeachment evidence. Accordingly, we reject Lane's assertion of ineffective assistance of counsel because he has failed to establish the factual basis of his claim.

## VII. CONCLUSION

We conclude that the trial court did not abuse its discretion by admitting unreliable cadaver dog evidence or denying Lane's motion for a mistrial when the prosecutor failed to

---

[65] *Unger*, 278 Mich App at 242.

[66] *Pickens*, 446 Mich at 312.

[67] *People v Trakhtenberg*, 493 Mich 38, 54; 826 NW2d 136 (2012).

[68] *People v Hoag,* 460 Mich 1, 6; 594 NW2d 57 (1999).

redact evidence that Lane was involved in a gang. We also conclude that sufficient circumstantial evidence supported Lane's convictions of felony murder and first-degree child abuse. We conclude that Lane has not shown that the prosecutor committed to misconduct and that Lane has not established the factual predicate of his ineffective assistance of counsel claim.

We affirm.

/s/ William C. Whitbeck
/s/ E. Thomas Fitzgerald
/s/ Christopher M. Murray