# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SEAN PHILIP DAILEY,

        Defendant-Appellant.

UNPUBLISHED
April 20, 2017

No. 329412
Wayne Circuit Court
LC No. 15-002595-01-FC

---

Before: MURPHY, P.J., and MURRAY and M. J. KELLY, JJ.

PER CURIAM.

A jury convicted defendant, Sean Dailey, of four counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), and furnishing alcohol to a minor, MCL 436.1701. The trial court sentenced Dailey to prison terms of 25 to 50 years for each CSC-I conviction, with three of the sentences to be served consecutively to each other, and the fourth sentence to be served concurrently with the sentences for the other counts. Dailey appeals as of right, and we affirm.

## I. BASIC FACTS

The complainant testified that Dailey, her father, had sexually assaulted her on multiple occasions in January and February 2015. The complainant was twelve years old at the time. She asserted that Dailey penetrated her vagina with his penis three times on January 19, 2015—two times before she went to bed and once in the morning after she showered. She also testified that he penetrated her vagina with his penis on Valentine's weekend 2015. Further, she stated that later in February 2015, while she was vacationing in Florida with Dailey, his girlfriend, and her half-sisters (Dailey's younger daughters), Dailey touched her vaginal area through her clothes. She testified that after that incident she tried to avoid Dailey, and when she returned to Michigan she disclosed the abuse to her mother and her maternal grandmother.

The complainant was forensically interviewed at Kids Talk. She was also physically examined by Dr. Mary Lu Angelilli. Dr. Angelilli testified that the physical examination did not reveal any evidence of sexual abuse. However, she also testified that the physical findings were consistent with the allegations of abuse because in most cases of sexual abuse there is no physical evidence. On cross-examination, she opined that the complainant was sexually abused, but clarified that her opinion was based on the history given by other persons and the written report from the forensic interview, not on the physical findings.

-1-

At trial, pursuant to MCL 768.27a, the prosecutor also presented evidence that in 1999, Dailey had sexually assaulted LS, who was only 14 years old at the time.

Dailey testified on his own behalf. With regard to the 1999 sexual assault allegations, he admitted that he engaged in sexual relations with LS. However, he testified that LS was his girlfriend at the time and that she fabricated the allegations because she was upset that he broke up with her. He admitted that he had been criminally charged with sexually assaulting LS and that he had pleaded no contest to one count of fourth-degree criminal sexual conduct.

Dailey denied sexually assaulting the complainant. He presented testimony suggesting that the complainant fabricated the allegations to retaliate against him for disciplining her while they were vacationing in Florida.

The jury convicted Dailey as charged. This appeal follows.

## II. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

Dailey first argues that the trial court erred by allowing the prosecutor to present evidence of his prior sexual assault of LS and evidence of the uncharged sexual misconduct against the complainant in Florida. At a pretrial hearing, the trial court held that the evidence was admissible pursuant to MCL 768.27a. We review for an abuse of discretion the trial court's decision to admit evidence. *People v Lane*, 308 Mich App 38, 51; 862 NW2d 446 (2014). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes or when it erroneously interprets or applies the law." *Id*.

### B. ANALYSIS

MCL 768.27a provides that "in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant. . . ." Although MRE 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," our Supreme Court has held that MCL 768.27a "establishes an exception to MRE 404(b) in cases involving a charge of sexual misconduct against a minor." *People v Watkins*, 491 Mich 450, 471; 818 NW2d 296 (2012). Nevertheless, evidence admitted under MCL 768.27a is subject to exclusion under the balancing test in MRE 403. *Id*. at 481.

> [W]hen applying MRE 403 to evidence admissible under MCL 768.27a, courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect. That is, other-acts evidence admissible under MCL 768.27a may not be excluded under MRE 403 as overly prejudicial merely because it allows a jury to draw a propensity inference. . . . .
>
> This does not mean, however, that other-acts evidence admissible under MCL 768.27a may never be excluded under MRE 403 as overly prejudicial. There are several considerations that may lead a court to exclude such evidence.

These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Id*. at 487-488.]

Dailey argues that the trial court should have excluded the evidence as overly prejudicial under MRE 403. Dailey contends that the court's application of MRE 403 "does not reflect any detailed analysis." He asserts that the 1999 sexual assault allegation is 16 years old and is not similar to the current sexual assault allegations. He argues that in the 1999 incident, LS was 15 years old and he was 18 years old, whereas in this case the complainant was 12 years old and he was 31 years old. Further, he was dating LS when he had sex with her and he did not ply her with alcohol. In contrast, his daughter was not dating him and alcohol was allegedly used. Likewise, he asserts that the allegation that he groped the complainant in Florida is also dissimilar because alcohol was not used and the incident did not involve penetration.

The record, however, reflects that the trial court carefully considered the probative value of the other-acts evidence against the danger of unfair prejudice. In particular, although the prosecutor argued that the assaults on LS and the complainant were similar because Dailey used a knife to threaten LS and he put his hands around the complainant's throat at one point, the trial court held that the evidence about the use of the knife would be substantially more prejudicial than probative and excluded it. The court, however, still concluded that the assaults were similar and allowed LS to testify. We agree that there were similarities. LS was 14 years old when Dailey assaulted her and the complainant was 12 years old when Dailey assaulted her. Further, LS and the complainant were both subjected to multiple penetrations. LS testified that before assaulting her, Dailey told her "it's going to happen one way or another." The complainant testified that Dailey made a nearly verbatim threat, telling her, "It's going to happen either way." Thus, although Dailey has directed us to dissimilarities between the two incidents, there are also similarities. By commenting on the similarities between both complainants' assaults, the trial court found that the first factor in *Watkins* did not strongly favor exclusion of the evidence. Further, in weighing the evidence, the court considered that the incidents occurred 16 years apart, but did not conclude that the temporal proximity, i.e., the second *Watkins* factor, weighed in favor of excluding the evidence in light of the similarities of the conduct. Dailey does not argue on appeal that any of the other *Watkins* factors weigh in favor of exclusion of LS's testimony under MRE 403, and we conclude that they do not. Under these facts, the trial court did not abuse its discretion when it admitted LS's testimony into evidence under MCL 768.27a.

The trial court also did not abuse its discretion in admitting evidence of Dailey's Florida sexual misconduct. The complainant's testimony that Dailey touched her genitals through her clothing was relevant to explain her motivation for disclosing Dailey's abuse to her mother. This evidence also was necessary to refute the defense theory that the complainant fabricated the abuse allegations because Dailey supported his girlfriend in disciplining the complainant during the trip. The jury was entitled to hear the complainant's alternative explanation for why she came forward with the accusations after returning from Florida. Moreover, Dailey does not identify any factors that would cause the probative value of this evidence to be substantially

outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion by admitting this evidence.

### III. MOTION FOR MISTRIAL

### A. STANDARD OF REVIEW

Dailey next argues that the trial court erred in denying his motion for a mistrial based on improper testimony by the prosecution's expert witness, Dr. Angelilli. Dailey contends that Dr. Angelilli improperly testified that the complainant's accusations of sexual abuse were credible. We review for an abuse of discretion the trial court's decision denying a defendant's motion for a mistrial. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). "A trial court should grant a mistrial only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Id*. (citation and quotation marks omitted).

### B. ANALYSIS

Dailey argues that an expert witness may not offer an opinion on the ultimate issue of whether sexual abuse actually occurred. In support, he directs us to our Supreme Court's decisions in *People v Beckley*, 434 Mich 691; 456 NW2d 391 (1990) (opinion by BRICKLEY, J) and *People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995), amended on other grounds 450 Mich 1212 (1995). In *Beckley* the Court addressed experts who "testified regarding the characteristics and patterns of behavior typically exhibited by sexually abused children." *Beckley*, 434 Mich at 697. Similarly, in *Peterson*, the Court addressed "expert syndrome evidence" regarding "behaviors common in other abuse victims." *Peterson*, 450 Mich at 370. The *Peterson* Court modified the ruling in *Beckley* and held:

> In these consolidated cases, we are asked to revisit our decision in [*Beckley*], and determine the proper scope of expert testimony in childhood sexual abuse cases. The question that arises in such cases is how a trial court must limit the testimony of experts while crafting a fair and equitable solution to the credibility contests that inevitably arise. As a threshold matter, we reaffirm our holding in *Beckley* that (1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty. However, we clarify our decision in *Beckley* and now hold that (1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility. [*Peterson*, 450 Mich at 352-353.]

Dailey contends that Dr. Angelilli's testimony violated this rule because she opined that the complainant was an actual victim of sexual abuse. However, unlike the experts in *Beckley* and *Peterson* who only testified about child sexual abuse victims in general, Dr. Angelilli testified as

a physician who conducted an actual physical examination of the complainant. Accordingly, we find that the issue in this case is not controlled by *Beckley* and *Peterson*.

Instead, we turn to our Supreme Court's decision in *People v Smith*, 425 Mich 98; 387 NW2d 814 (1986). In *Smith*, our Supreme Court addressed whether *examining physicians* could testify that a complainant had been sexually assaulted. *Id*. at 101. The Court, citing MRE 704, stated that "[i]t is . . . well-established that expert opinion testimony will not be excluded simply because it concerns the ultimate issue." *Smith*, 425 Mich at 106.[1] Further, reflecting on prior precedent, the Court indicated that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the "conclusion [is] nothing more than the doctor's opinion that the victim had told the truth." *Id*. at 109. Such testimony is not permissible because a "jury [is] in just as good a position to evaluate the victim's testimony as" the doctor. *Id*. However, an examining physician, if qualified by experience and training relative to treatment of sexual assault victims, can give an opinion with respect to whether a complainant had been sexually assaulted when the opinion is based on physical findings and the complainant's medical history. *Id*. at 110-112.[2] See also *People v Swartz*, 171 Mich App 364, 376-378; 429 NW2d 905 (1988) (holding that an examining physician's opinion testimony opining that the complainant was sexually assaulted was admissible given that his opinion was based on objective facts obtained from his physical examination of the complainant).

In this case, Dr. Angelilli actually conducted a physical examination of the complainant, so under *Smith* and *Swartz*, there was nothing improper regarding the prosecutor's question about whether Dr. Angelilli's findings were consistent with the allegations of abuse. Nevertheless, on cross-examination, Dr. Angelilli opined "that there was sexual abuse based upon what people told her and the report of the forensic interview." She did not base her opinion on the physical findings, which, as she explained were consistent with the allegations of sexual abuse only in the sense that most sexual assaults did not leave any physical signs of a sexual assault. Therefore, her opinion testimony on cross examination was improper under *Smith* and *Swartz*.

Nevertheless, although the testimony was improper, we do not agree that the trial court abused its discretion when it denied Dailey's motion for a mistrial based on the improper opinion testimony. "A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). Here, the improper testimony was first elicited on cross-examination during the following exchange:

> *Dailey's lawyer.* But in this case it's possible that there was not ever penetration at all? It's possible?

---

[1] MRE 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

[2] The *Smith* Court made clear that the complainant's history must be more than the complainant simply claiming that he or she was sexually assaulted. *Smith*, 425 Mich at 112 n 9.

> *Dr. Angelilli.* I can't—well, my opinion putting the whole evaluation together was that she was sexually abused, but it was not based on the examination of her hymen.

Dr. Angelilli's testimony was unresponsive to the question, which did not call for whether she had concluded that there was sexual abuse. Generally, an unresponsive, volunteered answer to a proper question is not grounds for granting a mistrial. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). Moreover, Dr. Angelilli's improper opinion testimony was not so egregious that the prejudicial effect of the testimony could not be removed using means other than a mistrial. Here, rather than granting a mistrial, the court indicated that it would, if requested, give a curative instruction to the jury. A curative instruction is presumed to cure prejudice caused by the admission of improper testimony. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Both Dailey's lawyer and the prosecutor indicated that they would work together to craft a proposed jury instruction to limit any prejudice caused by any improper opinion testimony.[3] Thereafter, the court instructed the jury that it could not use Dr. Angelilli's testimony to conclude that the complainant was telling the truth because whether the complainant was telling the truth was "for you to decide and no one else." The court also summarized the admissible portions of Dr. Angelilli's opinion testimony, pointing out that she had testified that the absence of physical evidence of abuse was consistent with both sexual abuse and the absence of sexual abuse. Therefore, in this case, the prejudicial effect of the error was removed by the court's instructions. The trial court's failure to declare a mistrial was within the range of reasonable and principled outcomes and does not amount to an abuse of discretion.

## IV. DEADLOCK JURY INSTRUCTIONS

### A. STANDARD OF REVIEW

Dailey argues that the trial court erroneously responded to jury notes expressing that it was deadlocked and improvidently required the jury to continue deliberations, with the result being that the court improperly coerced the jury's guilty verdict. Because Dailey did not object below, his claims are unpreserved. See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Unpreserved claims are reviewed for plain error affecting substantial rights. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation omitted).

---

[3] The record reflects that the parties and the court could not recall with specificity whether Dr. Angelilli had in fact given improper testimony in front of the jury or whether the improper testimony was elicited while the jury was excused. Based on our review of the record, it is plain that the jury heard improper testimony, that the improper testimony was elaborated upon outside the presence of the jury, that the court cautioned the lawyers about what would constitute improper testimony, and that the parties thereafter did not solicit additional improper testimony in front of the jury.

B. ANALYSIS

When a jury indicates that it is unable to reach a verdict, a trial court may give a supplemental jury instruction and direct them to continue deliberations so long as the supplemental instruction does not coerce a verdict. *People v Sullivan,* 392 Mich 324, 331-342; 220 NW2d 441 (1974). A supplemental instruction is impermissibly coercive if it would force a juror to surrender an honest conviction. *Id.* To determine whether a given instruction is impermissibly coercive, this Court considers whether the instruction has "an undue tendency of coercion—e.g., could the instruction given cause a juror to abandon his conscientious dissent and defer to the majority solely for the sake of reaching agreement?" *People v Hardin,* 421 Mich 296, 314; 365 NW2d 101 (1984). The instruction "must be examined in the factual context in which it is given" to determine whether there was a coercive effect on the jury. *Id.* at 315.

In this case, the jury cdeliberated for four days, during which they sent a number of notes to the court. On the first day, the jury sent a note asking to reopen the proofs. Later that day, they asked for transcripts and asked what would be a reasonable amount of time to deliberate. The court instructed the jury that it would not reopen the proofs, that transcripts could be made available but they should first rely on their collective memories and notes, and that there was no set amount of time to deliberate. On the second day, the jury sent a note asking about the proper protocol "if we are at an impasse and discussion is becoming loud and heated." In the same note, they asked to go to lunch. The court provided a supplemental instruction suggesting that the jury make a list of the issues dividing or confusing them and explaining that it would then try and help them with those issues. The jury never provided a list. Additionally, one juror sent a note stating that he "strongly" felt that he could not continue. After questioning by the court, he explained that he was concerned with a scheduled college examination, and the court stated that it would contact the professor on the juror's behalf. On the third day of deliberations, the jury sent a note stating that it was "hung." The court then read, for the first time, the deadlocked jury instruction in full. Later, after there were reports that the jurors were yelling and screaming at each other, the jury was sent home for the weekend. When they returned the following Monday, they reached a verdict.

Dailey argues that the trial court's "refusal to accept the jury's assessment that it was hopelessly deadlocked clearly put enormous pressure on the jury, and especially upon the juror with a scheduling conflict and the dissenting juror(s), who apparently had a reasonable doubt." The "impasse" note sent on the second day, however, was not a note indicating that the jury was at an impasse or otherwise deadlocked. Rather, the note, which included a request for a lunch break, suggested that the jurors were having difficulties with their deliberations, believed that they might reach an impasse, and wanted to know the proper procedure to follow. The court provided supplemental instructions suggesting that the jury make a list of issues that divided or confused them and submit the list to the court so that the court could attempt to provide additional assistance. The jury did not make such a list and submit it to the court. Instead, they continued their deliberations until the next day. They then sent a note plainly stating that they were deadlocked. In response to that note, the court read the deadlocked jury instruction in full, without deviation.

-7-

Contrary to Dailey's argument, the court was not required to accept the jury's "hung jury" declaration as a conclusive fact. The court properly gave the deadlocked jury instruction for the purpose for which it was written, namely, to ask the jurors to reevaluate their positions, subject to their duty to maintain their honest beliefs and not succumb to pressure to join the majority. We do not agree that the trial court's delivery of the instruction, which comported with M Crim JI 3.12, was focused on pressuring dissenting jurors to change their vote. Dailey has not demonstrated that the trial court committed a plain error affecting his substantial rights in giving the deadlocked jury instruction when it did.

We also reject Dailey's argument that the trial court placed improper pressure on the juror who was concerned about missing a college examination. There is no basis for inferring anything about that juror other than what was stated on the record in his exchange with the court. On the record before us, there is nothing to suggest that the juror was a dissenting juror pressured to join the majority because of scheduling concerns.

The trial court did not coerce the jury's verdict by reading the deadlocked jury instruction and requiring the jury to continue deliberations after it indicated it was deadlocked.

## V. CONSECUTIVE SENTENCING

### A. PRESERVATION AND STANDARD OF REVIEW

Finally, Dailey challenges the trial court's imposition of consecutive sentences for three of his CSC-I convictions pursuant to MCL 750.520b(3). Issues concerning the interpretation and application of a statute are reviewed de novo. *People v Corbin*, 312 Mich App 352, 361; 880 NW2d 2 (2015). Where discretionary consecutive sentencing is authorized, this Court reviews a trial court's decision to impose consecutive sentences for an abuse of discretion. *People v St John,* 230 Mich App 644, 648; 585 NW2d 849 (1998).

### B. ANALYSIS

When imposing consecutive sentences in this case, the trial court first noted that it had discretion to impose a consecutive sentence in this case because counts I, II, and III "grew out of a continuous time sequence and all had a connective relationship that was more than incidental." On appeal, Dailey concedes that the court had discretion to impose consecutive sentences in this case because counts I, II, and III allegedly arose from the same transaction as required by MCL 750.520b(3). He nevertheless raises two arguments with regard to the court's decision to impose consecutive sentences.

First, he asserts that his sentence is substantively unreasonable under the standard announced in *Gall v United States*, 552 US 38; 128 S Ct 586; 169 L Ed 2d 445 (2007). Dailey's reliance on *Gall* is misplaced because we have expressly rejected the *Gall* standard for reviewing the reasonableness of sentences in Michigan. See *People v Steanhouse*, 313 Mich App 1, 43-48; 880 NW2d 297 (2015).

Second, he argues that the trial court erred because it failed to provide a basis for its decision to impose consecutive sentences. In *People v Norfleet*, ___ Mich App ___; ___; ___ NW2d ___ (2016) (Docket No. 328968), slip op at 7, lv pending, this Court held that where a

consecutive sentence is discretionary, "[t]he decision as to each consecutive sentence is its own discretionary act and must be separately justified on the record." Further, "[w]hile imposition of more than one consecutive sentence may be justified in an extraordinary case, trial courts must nevertheless articulate their rationale for the imposition of each such sentence so as to allow appellate review." *Id*. The trial court remarked that the complainant was "a hero" for reporting the abuse in order to protect Dailey's other younger daughters. The court opined that Dailey's prior record variable score for the sentencing guidelines did not adequately take into account Dailey's prior conviction of fourth-degree CSC for an offense against a minor, failure to comply with his sex offender registry reporting duties, and his juvenile offenses of torturing an animal and setting a fire in the woods. The court noted that the Legislature authorized consecutive sentences for the purpose of "tak[ing] away security of concurrent sentences." The court stated that Dailey was a danger to the community and that the community likely needed to be protected from Dailey for the rest of his life. The court added that consecutive sentencing was appropriate in consideration of the Legislature's purpose in allowing consecutive sentencing. In addition, the court commented on the "connective relationship" of the three convictions for which consecutive sentencing was authorized. We conclude that the trial court's comments are sufficient to satisfy the requirement in *Norfleet* that the sentencing court articulate its particular reasons for imposing consecutive sentences. The trial court's reasons, considered in conjunction with the Legislature's express authorization of consecutive sentences in this type of situation, were sufficient to demonstrate an outcome within the range of reasonable and principled outcomes. Accordingly, the trial court did not abuse its discretion by imposing consecutive sentences, nor did it fail to provide a basis for its decision.

Affirmed.

/s/ William B. Murphy
/s/ Christopher M. Murray
/s/ Michael J. Kelly

-9-