*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ARTHUR LOUIS STANLEY,

        Defendant-Appellant.

UNPUBLISHED
July 29, 2021

No. 348240
Wayne Circuit Court
LC No. 17-004181-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

AUBREY JILES STANLEY, JR.,

        Defendant-Appellant.

No. 348474
Wayne Circuit Court
LC No. 17-004180-01-FC

Before: TUKEL, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

In this consolidated appeal, defendants Arthur Louis Stanley (Arthur) and Aubrey Jiles Stanley, Jr. (Aubrey), who are brothers, were tried jointly before the same jury. The jury found both defendants guilty of two counts of first-degree premeditated murder, MCL 750.316(1)(a), and one count of felon in possession of a firearm (felon-in-possession), MCL 750.224f. The jury also found Arthur guilty of possession of a firearm during the commission of a felony (felony-firearm), and found Aubrey guilty of felony-firearm, second offense, MCL 750.227b. The trial court sentenced Arthur to life imprisonment without the possibility of parole for each murder conviction, to two to five years' imprisonment for the felon-in-possession conviction, and to two years' imprisonment for the felony-firearm conviction. The trial court sentenced Aubrey to life imprisonment without the possibility of parole for each murder conviction, to two to five years'

imprisonment for the felon-in-possession conviction, and to five years' imprisonment for the felony-firearm, second offense, conviction. We affirm in both dockets.

## I. BACKGROUND

Defendants' convictions arise from the April 9, 2017 shooting deaths of the victims, who are brothers. The victims were each shot multiple times by two men, who were later identified as defendants. Testimony at trial supported that Aubrey believed that one of the victims, who was Aubrey's neighbor, had broken into his home and stolen some of his property. Defendants were convicted as charged and sentenced as described above. These appeals followed.

## II. DOCKET NO. 348240 (DEFENDANT ARTHUR STANLEY)

### A. APPOINTMENT OF SUBSTITUTE COUNSEL

Arthur first argues that the trial court violated his constitutional right to counsel by denying his requests for the appointment of new counsel. We disagree.

"We review issues of constitutional law de novo." *People v Parrott*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 350380); slip op at 3 (quotation marks and citation omitted), lv pending. "We review a trial court's decision denying substitution of counsel for an abuse of discretion. A trial court abuses its discretion when it issues a decision that falls outside the range of principled outcomes." *People v McFall*, 309 Mich App 377, 382; 873 NW2d 112 (2015) (citations omitted). "Appointment of a substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process." *People v Bauder*, 269 Mich App 174, 193; 712 NW2d 506 (2005), overruled in part on other grounds by *People v Burns*, 494 Mich 104, 112-113 (2013). In *McFall*, 309 Mich App at 382-383, this Court explained:

> An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced. Substitution of counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. Good cause may exist when a legitimate difference of opinion develops between a defendant and his appointed counsel as to a fundamental trial tactic, when there is a destruction of communication and a breakdown in the attorney-client relationship, or when counsel shows a lack of diligence or interest. A mere allegation that a defendant lacks confidence in his or her attorney, unsupported by a substantial reason, does not amount to adequate cause. Likewise, a defendant's general unhappiness with counsel's representation is insufficient. [Quotation marks and citations omitted.]

Arthur made two requests for the appointment of new counsel. His first request was made at his May 26, 2017 circuit-court arraignment, which was held less than one month after his attorney was appointed. Arthur did not identify any disagreement or other difference of opinion between himself and counsel or otherwise demonstrate a breakdown in the attorney-client relationship. Rather, Arthur complained about counsel's lack of communication. Although Arthur argues that the trial court improperly "failed to inquire into the breakdown in the relationship," the

-2-

case was still in its early stages. Indeed, trial did not commence until January 2019. As noted by the trial court at the May 2017 arraignment, Arthur had ample opportunity to communicate with counsel before trial. Because Arthur failed to establish good cause for the appointment of new counsel, we conclude that the trial court did not abuse its discretion by denying Arthur's first request for the appointment of new counsel. See *McFall*, 309 Mich App at 383.

In Arthur's second request for new counsel, he complained in a letter dated June 10, 2017, that counsel had not provided discovery materials and again was not communicating with him. However, when the trial court inquired into Arthur's claims at an August 11, 2017 hearing, Arthur informed the court that counsel "really [had] been representing" him. Consequently, Arthur requested that the trial court "just cancel that out." By affirmatively advising the trial court that it was no longer necessary to consider his request for substitute counsel, Arthur waived any claim of error related to this issue. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) ("One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error.") (Quotation marks and citation omitted.) Therefore, Arthur is not entitled to the relief that he seeks on appeal.[1] See *id*. at 215-216.

## B. SUFFICIENCY OF THE EVIDENCE—PREMEDITATION

Arthur argues that there was insufficient evidence of premeditation and deliberation to support his convictions of first-degree premeditated murder. We disagree.

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016) (quotation marks and citation omitted). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted). Circumstantial evidence and any reasonable inferences that can be drawn from the evidence may be sufficient to prove the elements of a crime. *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999).

"[D]ue process requires the prosecution to prove every element beyond a reasonable doubt." *People v Oros*, 502 Mich 229, 240 n 3; 917 NW2d 559 (2018). As relevant to this appeal, "[t]he elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *Id*. at 240 (alteration in original; quotation marks and citation omitted). Premeditation and deliberation are "distinct and separate terms[.]" *Id*. Premeditation requires a defendant "to think about beforehand," and deliberation requires a defendant "to measure and evaluate the major facets of a choice or problem." *Id*. (quotation marks and citation omitted).

---

[1] Although Arthur argues that the trial court "conditioned [his] constitutional right to counsel upon a waiver of his constitutional right to a speedy trial," this assertion is unsupported by the record.

Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a second look. That is, some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look. While the minimum time necessary to exercise this process is incapable of exact determination, [i]t is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds. . . . By the weight of authority the deliberation essential to establish murder in the first degree need not have existed for any particular length of time before the killing. The time within which a wicked purpose is formed is immaterial, provided it is formed without disturbing excitement. The question of deliberation, when all the circumstances appear, is one of plain common sense; and an intelligent jury can seldom be at a loss to determine it. [*Id*. at 242-243 (alteration in original; quotation marks, citations, and footnotes omitted).]

Upon a review of the record in the light most favorable to the prosecution, it is apparent that a rational trier of fact had sufficient evidence from which to draw reasonable inferences that Arthur acted with premeditation and deliberation.

At about 6:40 p.m. on April 9, 2017, Christopher Taylor (Christopher) arrived at the home of his sister, which is where one of the victims also lived. Christopher testified that Aubrey, who lived in a nearby home, approached him and complained that one of the victims and another man had broken into his home and stolen some of his property. During this discussion, Christopher suggested to Aubrey that he should "beat" the men's "ass[es]." Aubrey then returned to his home. At some point, Destini Germany saw Aubrey and another man arrive at Aubrey's house. Both men were armed with weapons. A short period of time before the shooting, Aubrey again approached Christopher, who was standing outside. This time, Aubrey indicated that things were "about to go down." Based on this comment, Christopher believed that his sister should leave her home.

Not long thereafter, Christopher saw defendants on Aubrey's front porch. Christopher also noticed that the victims were walking by on the sidewalk. According to Christopher, defendants "ran in[to]" Aubrey's home and returned about five seconds later with guns. Defendants then approached the victims, at which point Aubrey accused them of breaking into his home. Although one of the victims denied this, defendants began firing their weapons multiple times while they were "face-to-face" with the victims. Several individuals called 911 between 6:53 p.m. and 6:58 p.m. After the shooting, Arthur fled the scene and took steps to avoid being arrested, including changing his cell-phone number.

Arthur argues on appeal that the evidence primarily pointed to Aubrey as having a motive for acting with premeditation and deliberation because the evidence showed that he was upset about a burglary at his home and that he believed that one of the victims was responsible. However, the evidence supported that Aubrey was in telephone contact with Arthur less than one hour before the shooting. Although Christopher's testimony supported that defendants acted quickly upon seeing the victims walking down the street, a rational trier of fact could reasonably

find that both defendants had already formed a plan to kill and were waiting for one of the victims to appear. Indeed, when the victims did appear, defendants carried out their plan by retrieving lethal weapons from inside the home and then confronting and shooting the victims multiple times. Arthur clearly had the opportunity for a "second look" during the period of time that elapsed between when he retrieved the firearm and when he began shooting at the victims, one of whom attempted to run away. Moreover, the number of shots that were fired from the firearm that was used by Arthur supports an inference that he thought about, measured, and evaluated his options. See *People v Tilley*, 405 Mich 38, 45-46; 273 NW2d 471 (1979) (holding that the jury had sufficient evidence to support the conclusion of ample opportunity to premeditate and deliberate in the interval of time between the defendant securing possession of the gun and the volley of shots as the victim was retreating). We therefore conclude that a reasonable juror could have found that the killing was committed with premeditation and deliberation.

## C. PROSECUTORIAL ERROR—APPEALS FOR SYMPATHY

Next, Arthur argues that he was denied a fair trial because the prosecutor made repeated appeals to the jury to sympathize with the victims and their family. Because trial counsel did not object to the prosecutor's comments and request a curative instruction, the issue is unpreserved. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Unpreserved issues regarding prosecutorial error are reviewed "for outcome-determinative, plain error." *Id*. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

"A prosecutor has committed [error] if the prosecutor abandoned his or her responsibility to seek justice and, in doing so, denied the defendant a fair and impartial trial." *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014). "A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence." *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007). "Issues of prosecutorial [error] are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64. "The propriety of a prosecutor's remarks depends on all the facts of the case." *Id*. (quotation marks and citation omitted).

"Appeals to the jury to sympathize with the victim constitute improper argument." *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). "The prosecutor commits [error] when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *Lane*, 308 Mich App at 66. However, a prosecutor is permitted to argue the evidence and reasonable inferences arising from the evidence in support of his or her theory of the case. *People v Ackerman,* 257 Mich App 434, 450; 669 NW2d 818 (2003). In doing so, a prosecutor is not required to phrase his or her arguments in the blandest of terms, but may use "hard language" when the evidence supports it. *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996).

Arthur challenges the following emphasized portions of the prosecutor's closing argument:

Ladies and gentlemen, I want to first thank you for your time and attention during this case. I know it has been a longer case then you anticipated.

I know everyone was paying attention and we certainly appreciate it.

And I know the family in this case and I am sure the defense attorneys as well appreciate your time and attention.

*[The victims] can't tell us who killed them. They can't tell us. But the evidence left behind tells us.*

Christopher Taylor tells us. And Destini Germany also told us. And there [are] only two people ever in this entire trial that have been the people accused of killing [the victims]; and they are sitting right here. (Indicating.) Aubrey Stanley and Arthur Stanley.

The crux of this case, ladies and gentlemen as you may well know is identification. And I want to talk about that. Identification of the people that killed [the victims] . . . .

*And the unimaginable loss of the mother . . ., who you heard from, who had to lose both of her sons on the same night.*

How do we know that these two individuals killed these two individuals[?]

Identification and corroboration. Identification. You are going to get an instruction by the judge, ladies and gentlemen, about identification.

And when you think about identification you should think about it in these terms because this is what the law tells us. That you should examine the witnesses' identification testimony carefully. You may consider whether other evidence supports the identification. [Emphasis added.]

We conclude that the prosecutor's challenged remarks did not involve attempts to secure convictions by appealing to the jury's sympathy for the victims and their mother. The challenged comments were brief, and they were made to serve as the introduction to the prosecutor's theory of the case. Even to the extent that some of the remarks, when viewed in isolation, could be perceived as comments that evoked sympathy for the victims, this was not a theme that was repeated or emphasized throughout the prosecutor's closing argument. Rather, in arguing that defendants were guilty, the prosecutor focused on the evidence and addressed why the evidence established defendants' guilt. Importantly, the prosecutor did not urge the members of the jury to ignore the evidence or to suspend their powers of judgment to convict on the basis of sympathy. See *Lane*, 308 Mich App at 66. Therefore, when considering the prosecutor's arguments in context, we conclude that the prosecutor did not abandon his responsibility to seek justice. See *id*. at 62. Consequently, Arthur has failed to establish plain error.

Furthermore, to the extent that the prosecutor's remarks could be perceived as an appeal for sympathy, the standard jury instructions provided to the jury lessened any prejudicial effect of the prosecutor's comments. At the beginning of trial, the trial judge issued a standard preliminary instruction with respect to what constitutes evidence:

> After all the evidence has been presented, the prosecutor and defense lawyers will then make their closing arguments. And the closing arguments . . . are not evidence. They are only meant to help you understand the evidence and how each side sees the case and how each side wants you to see the case and why.

> In the end, you must base your verdict only on the evidence.

> * * *

> When it comes time to decide the case, you're only allowed to consider the evidence that was admitted in the case. And evidence here includes only the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I might tell you to consider as evidence.

After closing arguments, the trial judge again issued the following standard instruction:

> But many things that you may have thought of as evidence are actually not evidence. And you must be careful not to consider them as evidence.

> * * *

> [T]he lawyers' statements and arguments are . . . not evidence. They are only meant to help you understand the evidence and each side's legal theories.

> You should only accept the things that lawyers have said that are supported by evidence or by your own common sense.

Accordingly, the jury was instructed at the beginning and end of trial that the comments that the prosecutor made during closing arguments did not constitute evidence. Additionally, when issuing the final instructions, the trial court instructed the jurors that they must not let sympathy or prejudice influence their decision. Jurors are presumed to follow their instructions. See *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). Because we conclude that these standard instructions were sufficient to cure any prejudicial effect, Arthur has failed to establish plain error affecting his substantial rights.

### D. DEFENDANT ARTHUR STANLEY'S STANDARD 4 BRIEF

In a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Arthur argues that he was denied effective assistance of counsel because trial counsel decided to withdraw an alibi defense and instead focus on a defense of misidentification. We disagree that counsel was ineffective in this respect.

Generally, "[t]he question whether defense counsel performed ineffectively is a mixed question of law and fact[.]" *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). If the trial court has held a *Ginther*[2] hearing, the trial court must "find the facts, and then . . . decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "[T]his Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *Trakhtenberg*, 493 Mich at 47. Regard should be given to the trial court's opportunity to assess the credibility of the witnesses who appeared before it. MCR 2.613(C); see also *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). A finding is clearly erroneous if this Court "is left with a definite and firm conviction that the trial court made a mistake." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted).[3]

To demonstrate ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Abcumby-Blair*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347369); slip op at 8, lv pending (quotation marks and citations omitted).

> In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy. Yet a court cannot insulate the review of counsel's performance by calling it trial strategy. Initially, a court must determine whether the strategic choices [were] made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. [*Trakhtenberg*, 493 Mich at 52 (alteration in original; quotation marks and citations omitted).]

It is important to remember that "[a] trial strategy is not ineffective simply because it ultimately does not succeed. A strategy is also not ineffective because it entails taking calculated risks, especially if the range of available options for the defense is meager." *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020) (citation omitted).

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] We granted Arthur's motion to remand so that he could bring a motion for a new trial and have a *Ginther* hearing. *People v Arthur Stanley*, unpublished order of the Court of Appeals, entered August 20, 2020 (Docket No. 348240). After holding an evidentiary hearing, the trial court denied Arthur's motion for a new trial, concluding that Arthur had failed to establish that counsel was ineffective.

In this case, trial counsel filed a notice of alibi defense, naming three proposed alibi witnesses: Arthur's wife, Arthur's mother-in-law, and Arthur's sister. However, the alibi defense was later withdrawn, and those witnesses were not called at trial. Instead of pursuing an alibi defense, trial counsel argued that Christopher had misidentified Arthur as one of the shooters.

At the *Ginther* hearing, trial counsel explained that his investigation revealed that cell-phone records concerning a phone number that was associated with Arthur conflicted with the witnesses' proposed alibi testimony. Trial counsel testified that he had spoken to the witnesses and was concerned that the witnesses would not be credible, that their testimony could place them at risk of prosecution for perjury, and that counsel would be placed in an "ethical situation[.]" Trial counsel testified that he had discussed this with the alibi witnesses, who "seemed to . . . be concerned," and with Arthur, who agreed to abandon the proposed alibi defense. Although Arthur denied that he had discussed withdrawing the alibi defense with trial counsel before trial, the trial court appears to have found counsel's testimony to be more credible. We defer to the trial court's credibility determinations. *White*, 331 Mich App at 150. Therefore, we conclude that the trial court did not err by determining that trial counsel's performance was not unreasonable. See *Nix v Whiteside*, 475 US 157, 171; 106 S Ct 988; 89 L Ed 2d 123 (1986) (holding that a failure to present perjured testimony does not constitute ineffective assistance of counsel).

Additionally, we fail to see how there was a reasonable probability that the outcome would have been different had the alibi witnesses been called to testify at trial. Indeed, Christopher identified Arthur as one of the shooters a short period of time after the shootings occurred. Evidence also supported that Aubrey, who is Arthur's brother, had a motive to kill at least one of the victims because Aubrey believed that one of the victims had burglarized his home. Cell phones associated with Arthur and Aubrey were in communication with each other one hour before the shooting. Additionally, evidence supported that Arthur turned off his cell phone sometime after 7:00 p.m. on the day of the shootings and then changed his cell-phone number in the days following the shootings. Moreover, the jury was aware that Arthur's cell phone was located on the west side of Detroit near Warren Street and did not utilize towers in the direct area of the shooting. For these reasons, we conclude that this claim of ineffective assistance of counsel fails.

E. DEFENDANT ARTHUR STANLEY'S SUPPLEMENTAL BRIEF

In his supplemental brief, Arthur raises two additional claims of ineffective assistance of counsel. Specifically, Arthur argues that trial counsel was ineffective (1) by abandoning the alibi defense without investigating the cell-phone records and (2) by failing to move for appointment of an expert witness.

1. CELL-PHONE RECORDS

With respect to Arthur's argument that trial counsel unreasonably decided to abandon the alibi defense without actually investigating the cell-phone records, the record does not support this claim. Indeed, trial counsel testified at the *Ginther* hearing that he had "received discovery

materials from the Prosecution, that included . . . cell phone records, cell phone mapping, and cell phone . . . diagrams." Counsel further testified:

> Going over it very carefully with [Arthur], both the cell phone records of the phone calls, the cell phone diagrams, and the cell, cell phone, uhm, mapping, uhm, he and I began to be concerned that there would be a great deal of discrepancy, and, and, and I did not necessarily determine, or don't really remember determining, how far the distance is away, but it certainly appeared that there were going to be some discrepancies, with regard to the alibi, uhm, theory.

> * * *

> Mr. Stanley and I went over those, very carefully, in terms of the diagrams, and the graphics, and the phone calls, and speculated as to what likely would be the expert testimony of [Stan Brue[4]], and the possible jeopardy that his alibi witnesses would be in, in the event that they were not found to be credible.

Counsel added that the apparent discrepancies were "going to possibly put into jeopardy [Arthur's] wife, his mother-in-law, and some other relative, with regard to their testimony, in terms of credibility," as well as "the possibility . . . that there could be potential charge[s] of perjury." Indeed, even Arthur admitted at the *Ginther* hearing that he and trial counsel discussed the cell-phone records before the alibi defense was withdrawn. While Arthur testified that counsel informed him that he did not understand the records, Arthur does not discuss the records themselves or present any argument to challenge the accuracy of trial counsel's explanation that the records raised discrepancies with the alibi witnesses' proposed testimony. Because there is no evidence that further investigation would have revealed that the records did not contradict the proposed alibi testimony, we conclude that counsel was not ineffective for failing to investigate the cell-phone records further.

## 2. EXPERT WITNESS

Arthur also argues that trial counsel was ineffective for failing to move for the appointment of a defense expert who could testify about the analysis of cell-phone records. We disagree.

Our Supreme Court has recognized that "[t]he right to offer the testimony of witnesses . . . is in plain terms the right to present a defense[.]" *People v Kowalski*, 492 Mich 106, 139; 821 NW2d 14 (2012) (quotation marks and citation omitted). However, in *People v Kennedy*, 502 Mich 206, 227; 917 NW2d 355 (2018), our Supreme Court held that, in order for an indigent defendant to be entitled to funds, "a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial" (quotation marks and citation omitted). In this case, Arthur fails to explain or rationalize why an expert was necessary to his defense. Instead, Arthur merely asserts that such an expert was necessary because counsel decided to abandon the alibi defense as a result of the cell-phone records. This assertion is insufficient.

---

[4] Brue was qualified as an expert in the area of "call detail record analysis."

See *id*. at 226. Because Arthur has failed to establish that he would have been entitled to an expert in cell-phone analysis had counsel filed such a motion, Arthur's ineffective assistance of counsel argument fails in this respect. See *People v Buie (On Remand)*, 298 Mich App 50, 66; 825 NW2d 361 (2012) (counsel is not ineffective for failing to make a futile motion).

Finally, to the extent that Arthur argues that this Court should remand the matter again so that another *Ginther* hearing can be held, we conclude that Arthur is not entitled to this relief. Indeed, Arthur has not set forth any facts that would require development of a record to determine if trial counsel was ineffective. MCR 7.211(C)(1)(a).

## III.  DOCKET NO. 348474 (DEFENDANT AUBREY STANLEY, JR.)

### A.  INEFFECTIVE ASSISTANCE OF COUNSEL

Aubrey raises several claims of ineffective assistance of counsel, which he also raised below in relation to his motion for a new trial.[5] We conclude that none of the arguments have merit.

### 1.  FAILING TO REQUEST A SEPARATE TRIAL

Aubrey argues that his trial counsel was ineffective for failing to move for severance of his and Arthur's trials.[6] "Under MCR 6.121(C), the trial court 'must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant.' " *People v Furline*, 505 Mich 16, 20; 949 NW2d 666 (2020). "A defendant's claim of prejudice must be substantiated through concrete facts." *Id*. at 21 (quotation marks and citation omitted). Additionally,

> severance may be warranted when [the] defendants' mutually exclusive or antagonistic defenses create a serious risk of prejudice. But . . . the defenses must be irreconcilable and create such great tension that a jury would have to believe one defendant at the expense of the other. Defenses are mutually exclusive . . . if the jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the core of the evidence offered on behalf of the co-defendant. Prejudice requiring reversal occurs only when the competing defenses are so antagonistic at their cores that both cannot be believed. But incidental spillover

---

[5] After sentencing, Aubrey filed a motion for a new trial, arguing that his trial counsel was ineffective. After holding a *Ginther* hearing, the trial court denied Aubrey's motion for a new trial.

[6] Aubrey also argues that trial counsel was ineffective for failing to move for a mistrial after "jail calls" were admitted into evidence. However, because Aubrey does not explain or rationalize this argument, it is abandoned and need not be considered. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Additionally, although Aubrey notes that the jury was permitted to hear a portion of an interrogation wherein Aubrey indicated that he wanted to speak to an attorney, Aubrey does not argue in a meaningful manner this amounted to reversible error.

prejudice, which is almost inevitable in a multi-defendant trial, does not suffice. [*Id*. (quotation marks and citations omitted).]

Aubrey argues that severance was necessary to avoid prejudice because he and Arthur are brothers who wanted to assert different defenses at trial. According to Aubrey, he was unable to argue that he and Arthur acted in self-defense because it would have been "completely inconsistent" with Arthur's defense, which was misidentification. However, trial counsel testified that Aubrey was "adamant" that he did not want to present a self-defense theory and that Aubrey never stated that either victim was armed. Indeed, the record establishes that defendants approached the victims, who were unarmed, on a sidewalk. Moreover, Aubrey initially informed trial counsel that he was not present at the scene of the shootings. Aubrey also told members of law enforcement after he was arrested in April 2017 that he was not present at the time of the shootings.

Trial counsel also testified that she had communicated with Arthur's attorney to coordinate their defense strategies, and she was aware that Arthur's defense theory at trial was that he was not present at the time of the shootings. Given this testimony, trial counsel had no basis for believing that Aubrey's and Arthur's planned defenses would be mutually exclusive or irreconcilable such that separate trials were necessary. Because Aubrey has failed to establish that there is a reasonable probability that a motion for severance of trial would have been granted if counsel had so moved, this claim of ineffective assistance of counsel must fail. See *Buie (On Remand)*, 298 Mich App at 66 (counsel is not ineffective for failing to make a futile motion).

## 2. FAILURE TO LOCATE AND PRODUCE JOSEPH TAYLOR AS A WITNESS

Aubrey also argues that trial counsel was ineffective for failing to interview, produce, and call Joseph Taylor (Joseph), who was present at the scene of the shooting, as a witness at trial. We disagree. Trial counsel testified at the *Ginther* hearing that a defense investigator attempted to locate Joseph "well before trial" to determine what information he could provide, but the efforts to find him were unsuccessful.[7] Trial counsel also requested assistance from the prosecution, but those efforts were also unsuccessful. Because Aubrey has not shown that trial counsel could have done anything more to find and produce Joseph for trial or that counsel's efforts to locate Joseph were objectively unreasonable, this argument must fail.

Furthermore, Aubrey has not demonstrated that he was prejudiced by the failure to locate and produce Joseph as a witness at trial. At the evidentiary hearing, Aubrey indicated that Joseph's testimony "could have shown that the victims . . . had weapons and [that] they were shooting at [Aubrey]." However, upon questioning by the trial court, Aubrey admitted that he did not know what testimony Joseph would have provided if he had been called as a witness. Indeed, the record supports that Joseph would not have benefitted Aubrey's defense given that Joseph told members of law enforcement that he was unable to see the shooting because he was driving away from the

---

[7] Although Aubrey questions whether a defense investigator was actually used, the record indicates that the trial court granted trial counsel's request for a defense investigator shortly after counsel was appointed. Additionally, the investigator's efforts to locate Joseph were discussed on the record before trial.

scene.  Accordingly, Aubrey has not demonstrated a reasonable probability that the failure to produce and call Joseph as a witness affected the outcome of his trial.

### 3.  FAILURE TO PRESENT A THEORY OF SELF-DEFENSE

Aubrey also argues that trial counsel was ineffective for not presenting a theory of self-defense.  As discussed earlier, however, trial counsel testified at the *Ginther* hearing that Aubrey was "adamant" that he did not want to present a self-defense theory and that he had never stated that the victims were armed.  Although Aubrey testified differently at the evidentiary hearing, the trial court discredited Aubrey's testimony because he had offered inconsistent defense theories and had informed law enforcement that he was not present at the time of the shootings.  Under these circumstances, trial counsel's decision not to pursue a claim of self-defense was not objectively unreasonable.  Furthermore, given the facts of this case, we conclude that Aubrey cannot demonstrate that there is a reasonable probability that the outcome of trial would have been different if that theory had been presented.

### B.  DEFENDANT AUBREY STANLEY, JR.'S STANDARD 4 BRIEF

Aubrey also argues in a pro se Standard 4 brief that the prosecutor's conduct denied him a fair trial.  Because the arguments are unpreserved, we review "for outcome-determinative, plain error."  See *Unger*, 278 Mich App at 235.

### 1.  APPEALS TO THE JURY'S SYMPATHY

Aubrey first argues that the prosecutor erred by appealing to the jury to sympathize with the victims and their family.  Because Aubrey's arguments are identical to those raised by Arthur, we reject Aubrey's prosecutorial error argument for the reasons explained above.

### 2.  PHOTOGRAPHIC EVIDENCE

Aubrey next argues that the prosecutor erred by offering photographic evidence that was unfairly prejudicial.  First, he claims that the prosecutor displayed a photograph of the victims during closing argument that was so disturbing that it caused one juror to cry.  However, Aubrey has not identified the photograph that he alleges was displayed.  Additionally, we have reviewed the prosecutor's closing and rebuttal arguments and did not find any indication in the transcript that a photograph provoked an emotional response by a juror.  Thus, because Aubrey's argument is unsupported by the record, we conclude that he has not demonstrated plain error in this respect.

Aubrey next argues that the prosecutor improperly sought the admission of unfairly prejudicial autopsy photographs.  We reject this argument.  As explained in *People v Noble*, 238 Mich App 647, 660-661; 608 NW2d 123 (1999):

> [P]rosecutorial [error] cannot be predicated on good-faith efforts to admit evidence.
> The prosecutor is entitled to attempt to introduce evidence that he [or she]
> legitimately believes will be accepted by the court, as long as that attempt does not
> prejudice the defendant.  [Citations omitted.]

In this case, the record establishes that the prosecutor advanced good-faith arguments in favor of the relevancy and admissibility of the photographic evidence. Specifically, during a November 2018 motion hearing, the prosecutor requested that the trial court allow the admission of multiple photographs that depicted the victims' injuries, which included gunshot wounds to the victims' heads. The prosecutor argued that the photographs, although gruesome, were relevant to show intent to kill and to corroborate certain witnesses' testimony. The trial court indicated that a number of the photographs were "disturbing to look at" and ruled that only one photograph, which depicted a gunshot wound to the back of one of the victim's heads, was admissible. In doing so, the trial court recognized that the proffered photographs were being offered for permissible purposes, but indicated that it was endeavoring to minimize any potential prejudicial effect.[8] Because Aubrey has not demonstrated that the prosecutor did not act in good faith in offering this evidence, Aubrey is not entitled to relief. See *id*. at 661.

Affirmed in both dockets.


/s/ Jonathan Tukel
/s/ David H. Sawyer
/s/ Thomas C. Cameron

---

[8] Aubrey does not challenge the trial court's decision to admit the photograph into evidence.