*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROTUNDA DEMTRIUS MCCRAY,

Defendant-Appellant.

UNPUBLISHED
August 12, 2021

No. 353200
Monroe Circuit Court
LC No. 19-245306-FH

Before: RIORDAN, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of possession of a controlled substance less than 25 grams (cocaine), MCL 333.7403(2)(a)(*v*), maintaining a drug house, MCL 333.7405(1)(d), and assaulting, resisting, or obstructing a police officer, MCL 750.81d(1). Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 46 to 180 months' imprisonment for the drug-possession and drug-house convictions, which run concurrently to each other and consecutively to a prison term of 36 to 180 months for the resisting-or-obstructing conviction. We affirm.

## I. FACTUAL BACKGROUND

This case arises from a drug raid at a home on Wood Street in Monroe on February 27, 2019. In February 2019, Nickilas Bowling routinely drove defendant around town. Defendant paid Bowling for his chauffeuring services. Bowling knew that defendant sold drugs, and he observed defendant in possession of drugs on many occasions. On February 25, 2019, Bobbi Dansard drove an unidentified man known as "Black" to the Wood Street house to purchase crack cocaine. Dansard stayed in the car while Black went to the house. Defendant, who Dansard knew as "Bay Bay," opened the door and Black went inside. When Black returned to the car, he had crack cocaine. Dansard and Black returned to the Wood Street address several more times that day to purchase more drugs.

On February 26, 2019, Bowling dropped defendant off at the Wood Street house and then left. That same day, when Dansard was subject to a probation compliance check, Lieutenant Derek Lindsey found particles of crack cocaine on the floorboard of Dansard's car. Dansard told

Lieutenant Lindsey that she had purchased the crack cocaine at the Wood Street home, and Lieutenant Lindsey relayed this information to the Monroe Area Narcotics Team and Investigative Services (MANTIS). Detective Robert Blair authored a search warrant affidavit based on the information Dansard provided, and a search warrant was issued.

On February 27, 2019, defendant drove Bowling and Kassie Wright in Bowling's car to the Wood Street house in the morning. While they were driving, Bowling saw a bag with smaller bags of crack cocaine packaged inside roll out of defendant's jacket and hit the center console, and then defendant tucked it back into his jacket. Shortly after defendant and the others arrived at the house, police knocked and announced that they were entering the house to execute the search warrant. Their entry was delayed because they struggled to open the screen door and had to use a battering ram on the main door of the home. Still inside, Bowling saw defendant flush bags of drugs down the toilet. The two men ran into each other, resulting in defendant's sliding into the toilet and breaking the bowl. Bowling was apprehended at the bottom of the stairs, but defendant ran upstairs. Wright and another woman, Lawanda Jackson, were secured by police officers in the living room. Lieutenant Lindsey and Detective Blair went upstairs and detained a man, Jeffrey Campbell.

Lieutenant Lindsey encountered defendant in the hallway upstairs, and she could see that defendant was chewing something—a typical way to dispose of drugs. Lieutenant Lindsey ordered defendant to the ground, but defendant ran into another bedroom. Lieutenant Lindsey again ordered defendant to the ground, and when he did not comply, Lieutenant Lindsey hit defendant and climbed on top of him. Defendant covered his face with his hands. He denied that he had anything and then stuck out his tongue. Lieutenant Lindsey handcuffed defendant and patted him down, finding a key ring and a wad of money. One of the keys opened the front door and dead bolt of the Wood Street home. Lieutenant Lindsey did not remember if defendant was wearing an overcoat, but several officers indicated that it would have been standard practice to let defendant put on a coat because of the February weather conditions. The coat would typically be patted down first. None of the officers who testified remembered giving defendant a coat or knew who gave defendant a coat to wear.

As the police searched the rest of the home, defendant was brought downstairs to the living room where everyone was being detained. The police discovered drug paraphernalia, drug residue, and pills throughout the house. Detective Jordan Long patted defendant down for weapons. When defendant was sitting on the couch with his hands cuffed behind his back, Detective Long saw defendant lean over to one side and assumed that it was because the handcuffs were uncomfortable. Detective Long asked defendant what he was doing, and defendant explained that his leg hurt from a previous gunshot wound, but his movements were consistent with someone trying to hide something.

Troopers Nicholas Kaiser and Kody Richardson transported Bowling and defendant in the same vehicle from the Wood Street house to the county jail. Trooper Kaiser secured Bowling in the front passenger seat and drove the vehicle. Trooper Richardson secured defendant in the back passenger-side seat, and Trooper Richardson sat beside him. Customarily, the troopers would pat down anyone before securing them in the patrol vehicle, but the troopers did not search Bowling or defendant because they were already handcuffed, leading the troopers to assume that they had already been searched inside the house. Defendant was wearing an outer winter coat, and Trooper

Richardson noticed defendant make a movement in the backseat. He thought that defendant was simply adjusting himself because of the handcuffs. They had to wait about 10 minutes to enter the jail garage, and during the wait defendant asked that the windows be rolled down.

When Bowling and defendant were brought in for booking, Corrections Officer Austin Harvey found two rocks of crack cocaine tied in the corners of a sandwich bag in the left pocket of defendant's outer coat. The found drugs were tested, and the test revealed that defendant had been carrying 6.719 grams of crack cocaine in his coat. Defendant was charged with delivery or manufacture of a controlled substance less than 50 grams, MCL 333.7401(2)(a)(*iv*), maintaining a drug house, and assaulting, resisting, or obstructing a police officer. After a two-day jury trial, he was found guilty of the latter two offenses, along with the lesser offense of possession of a controlled substance less than 25 grams.

## II. DEMONSTRATIVE EVIDENCE

Defendant argues that the trial court abused its discretion by denying defendant's request to have Detective Blair handcuff defendant as a demonstrative aid to show defendant's mobility while cuffed because it would have rebutted the prosecution's theory that defendant possessed the drugs. We disagree.

A trial court's decision regarding the admissibility of evidence is reviewed for an abuse of discretion. *People v Lane*, 308 Mich App 38, 51; 862 NW2d 446 (2014). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes or when it erroneously interprets or applies the law." *Id*. (citations omitted). Additionally, as observed by our Supreme Court in *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999):

> [D]ecisions regarding the admission of evidence frequently involve preliminary questions of law, e.g., whether a rule of evidence or statute precludes admissibility of the evidence. This Court reviews questions of law de novo. Accordingly, when such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law. [Citation omitted.]

"Demonstrative evidence is admissible when it aids the fact-finder in reaching a conclusion on a matter that is material to the case." *People v Bulmer (After Remand)*, 256 Mich App 33, 35; 662 NW2d 117 (2003). "[W]hen evidence is offered not in an effort to recreate an event, but as an aid to illustrate an expert's testimony regarding issues related to the event, there need not be an exact replication of the circumstances of the event." *Id*. But demonstrative evidence "must satisfy traditional requirements for relevance and probative value in light of policy considerations for advancing the administration of justice." *People v Castillo*, 230 Mich App 442, 444; 584 NW2d 606 (1998). See also *Bulmer*, 256 Mich App at 35 (explaining that "demonstrative evidence must be relevant and probative"); MRE 401-403. "[T]he case law of this state has established no specific criteria for reviewing the propriety of a trial court's decision to admit demonstrative evidence." *Castillo*, 230 Mich App at 444. Thus, this Court adopted the test from *State v Carter*, 955 SW2d 548, 561 (Mo, 1997), where the demonstrative exhibit was a weapon:

A weapon similar to one allegedly used in the commission of a crime may be admitted as demonstrative evidence where substantial evidence attests to the similarity of the exhibit offered to the weapon allegedly used, there is no reasonable likelihood that the jury may fail to understand the demonstrative nature of the evidence, and the opposing party has ample opportunity for cross-examination regarding the demonstrative weapon. [*Castillo*, 230 Mich App at 444-445.]

Detective Blair testified that there were different types of handcuffs used by police officers, and he did not know which kind had been used on defendant. Lieutenant Lindsey, who had testified earlier, was not asked by defense counsel about the type of handcuffs that he used on defendant. Witness Lieutenant Marc Moore also did not know what type of handcuffs had been placed on defendant. Detective Blair did not have a set of handcuffs with him when he was testifying, so defense counsel asked the court for a short recess for Detective Blair to retrieve handcuffs for defendant to try on. The court denied this request.

After the last of the prosecution's witnesses testified, the court dismissed the jury for a recess and told the parties that it learned that defendant intended to produce a demonstrative aid. Defense counsel stated that it would be offered "in rebuttal," to which the court replied that rebuttal is only allowed for the prosecution. Defense counsel noted that he wanted to secure a pair of handcuffs for Detective Blair to put on defendant to demonstrate defendant's mobility. The court asked whether defendant would testify, and when defense counsel indicated that he would not, the court answered, "Then that will not happen in this case." The trial court stated that this was something that should have been anticipated before trial and that any time a demonstrative aid is to be used counsel should bring it to the court's attention before trial, which was not done. Therefore, the court would not allow it.

The trial court did not abuse its discretion by denying defense counsel's request to admit a demonstrative exhibit because the elements of the *Carter* test provided in *Castillo*, 230 Mich App at 444-445, were not met. Detective Blair was qualified as an expert in narcotics enforcement. Seemingly, the evidence was offered to illustrate an issue related to his expert testimony of the event; therefore, an "exact replication" was not needed. *Bulmer*, 256 Mich App at 35. There was, however, no substantial evidence attesting to the similarity of any handcuffs to be admitted to those used on defendant during the drug raid. *Castillo*, 230 Mich App at 445. Rather, Detective Blair and Lieutenant Moore both testified that there are various kinds of handcuffs, and neither officer knew exactly which type was used on defendant. Additionally, and importantly, defense counsel wanted Detective Blair to put handcuffs on defendant to demonstrate defendant's mobility, yet defendant intended to exercise his right not to testify. Thus, there would have been no opportunity for the prosecution to cross-examine defendant regarding his mobility while handcuffed. *Id*. Reversal is unwarranted.

## III. CONSECUTIVE SENTENCING

Defendant next argues that the trial court abused its discretion by sentencing defendant to a consecutive sentence with respect to the conviction for assaulting, resisting, or obstructing an officer. We disagree.

"A consecutive sentence cannot be imposed under Michigan law in the absence of statutory authority. Therefore, whether a trial court may impose a consecutive sentence is a question of statutory interpretation, which is reviewed de novo." *People v Clark*, 315 Mich App 219, 224; 888 NW2d 309 (2016) (citations omitted). The trial court's decision to impose a consecutive sentence "is reviewed for an abuse of discretion, i.e., whether the trial court's decision was outside the range of reasonable and principled outcomes." *People v Norfleet*, 317 Mich App 649, 654; 897 NW2d 195 (2016).

MCL 750.81d(1) provides that "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00 or both." MCL 750.81d(6) provides that "[a] term of imprisonment imposed for a violation of this section may run consecutively to any term of imprisonment imposed for another violation arising from the same transaction." The use of the term "may" in a statute denotes discretionary or permissive action. *Wilcoxon v City of Detroit Election Comm*, 301 Mich App 619, 631; 838 NW2d 183 (2013).

Courts that impose a discretionary consecutive sentence must articulate on the record the reasons for doing so in order to aid appellate review. *Norfleet*, 317 Mich App at 664-665. Michigan has a clear preference for concurrent sentencing. *Id*. at 665. Indeed, consecutive sentencing is considered strong medicine. *Id.* A trial court cannot simply make general references to a defendant's background and history or to the crime involved. *Id*. at 666. Rather, the court must give particularized reasons for imposing a consecutive sentence. *Id*. Consecutive sentencing may be appropriate for "those who have been found guilty of more serious crimes and who repeatedly engage in criminal acts." *People v Smith*, 423 Mich 427, 445; 378 NW2d 384 (1985).

The prosecution filed a sentencing memorandum requesting consecutive sentencing for the resisting-or-obstructing conviction in light of defendant's criminal history, the fact that he was on probation when he committed the offense, and his interference with the administration of justice during the search. At sentencing, defense counsel argued that defendant should be sentenced concurrently on all charges, as recommended in the presentence investigation report, and that the prosecution could not rely on allegations rejected by the jury to stack the charges. The trial court concluded as follows:

> I think [the prosecutor] is absolutely right when we just look at [defendant's] record. And you have to agree with me, [defendant], you can't argue out of it, it's an atrocious record, 17 prior felonies . . . [and] 19 misdemeanors. And I mean some can't even be scored here because of the dates.
>
> And you are right, you're getting old and you gotta stop this stuff because you've been to prison so many times, and you get out, and then you re-offend again.
>
> * * *
>
> I've considered everything here. And here again, it's what we have within this community, granted, he's convicted of Possession of a Controlled Substance,

but also Maintaining a Drug House, which has become a blight upon this community. It just never seems to end anymore.

And then the other thing I can't countenance, and you know this, and especially when you've been around the block, [defendant], you gotta go and scrap with the police of all things, and you pick up the R and O charge.

And you get caught with the stuff, you know, usually when you're, I don't wanna call it educated, but when you're as tenured as you are, usually, hopefully, most of the guys give up say yep, I got caught again, but no, we have to get all this danger going. People can get hurt, including yourself, people can get killed because there can be shootouts or there's fights with the police and things like that, and that I cannot countenance.

So, the Court finds the following to be a fair and proportionate sentence. It is for the protection of society. This is more than reasonable. This is more than just. . . .

Given this explanation, we conclude that the trial court did not abuse its discretion by imposing a consecutive sentence. The court spoke in more than just general terms, giving specific reasons for the imposition of the sentence, namely, defendant's extensive criminal record of 36 prior convictions, his pattern to reoffend, the threat to the community created by his operation of a drug house, and the danger involved when defendant resisted the police. Thus, to the extent that defendant argues that the court's reasons were too generalized, we reject the argument.

Defendant maintains that it was improper for the court to rely on his extensive criminal history to impose the consecutive sentence because his record was already taken into consideration when he was sentenced as a fourth-offense habitual felony offender. We initially note, again, that defendant had *17 prior felony convictions*; consequently, the *fourth*-habitual status certainly did not adequately contemplate his extensive record. Moreover, for purposes of consecutive sentencing, a trial court is permitted to consider a defendant's extensive and violent criminal history, his failure at rehabilitation, his history of drug dealing, and his history of manipulation. *People v Norfleet (On Remand)*, 321 Mich App 68, 72-73; 908 NW2d 316 (2017). Defendant also contends that consecutive sentencing is improper when based on an offense that a trial court personally finds particularly egregious, alluding to the court's indication in the present case that drug trafficking is a blight on the community. Defendant cites an unpublished opinion in support, which itself provided no citation for the proposition. But, nonetheless, even were the case useful to the instant case, the trial court's comment was brief, and the court clearly imposed a consecutive sentence because of defendant's extensive criminal history and repeated failures at rehabilitation. In sum, we affirm the consecutive sentence for resisting-or-obstructing an officer.

## IV. SEARCH AND SEIZURE

Defendant next argues that the trial court should have suppressed the evidence against him that was secured during the search and seizure because the search warrant affidavit was insufficient to establish probable cause. We disagree.

A trial court's factual findings at a suppression hearing are reviewed for clear error. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Hornsby*, 251 Mich App 462, 466; 650 NW2d 700 (2002). "But the application of constitutional standards regarding searches and seizures to essentially uncontested facts is entitled to less deference; for this reason, we review de novo the trial court's ultimate ruling on the motion to suppress." *Williams*, 472 Mich at 313.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." US Const, Am IV.[1]

"A magistrate shall only issue a search warrant when he or she finds that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *People v Franklin*, 500 Mich 92, 101; 894 NW2d 561 (2017). "Generally, in order for a search executed pursuant to a warrant to be valid, the warrant must be based on probable cause." *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004). "Probable cause sufficient to support issuing a search warrant exists when all the facts and circumstances would lead a reasonable person to believe that the evidence of a crime or the contraband sought is in the place requested to be searched." *People v Ulman*, 244 Mich App 500, 509; 625 NW2d 429 (2001) (quotation marks and citation omitted). "When probable cause is averred in an affidavit, the affidavit must contain facts within the knowledge of the affiant rather than mere conclusions or beliefs." *Id.* "The affiant may not draw his or her own inferences, but rather must state matters that justify the drawing of them." *People v Martin*, 271 Mich App 280, 298; 721 NW2d 815 (2006). The affidavit in support of a warrant request must be read in a common-sense and realistic manner. *People v Russo*, 439 Mich 584, 603; 487 NW2d 698 (1992). "[A]ppellate scrutiny of a magistrate's decision involves neither de novo review nor application of an abuse of discretion standard[;] [r]ather, the preference for warrants . . . requires the reviewing court to ask only whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *Id.* An affiant officer's personal experience is relevant to the establishment of probable cause. *Ulman*, 244 Mich App at 509. And police officers are presumptively reliable. *Id.* It is also presumed that affidavits supporting search warrants are valid. *People v Mullen*, 282 Mich App 14, 23; 762 NW2d 170 (2008).[2]

---

[1] "The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation." Const 1963, art 1, § 11.

[2] MCL 780.653 provides:

Defendant argues that the search warrant affidavit was insufficient to establish probable cause because it "contained hearsay statements from an unidentified party [Black] whose credibility is unsubstantiated."

Probable cause for issuance of a search warrant may be based on hearsay. MCL 780.653; *People v Harris*, 191 Mich App 422, 425; 479 NW2d 6 (1991). When hearsay is the basis for probable cause, the magistrate must determine whether all of the information provided in the affidavit establishes a fair probability that contraband or evidence of a crime will be located in a particular place. *Illinois v Gates*, 462 US 213, 238-239; 103 S Ct 2317; 76 L Ed 2d 527 (1983). "The personal knowledge element should be derived from the information provided or material facts, not merely a recitation of the informant's having personal knowledge. If personal knowledge can be inferred from the stated facts, that is sufficient to find that the informant spoke with personal knowledge." *People v Stumpf*, 196 Mich App 218, 223; 492 NW2d 795 (1992) (citations omitted). An independent investigation conducted by the police that verifies the accuracy and reliability of the information provided by an informant supports the issuance of a search warrant. *People v Waclawski*, 286 Mich App 634, 699; 780 NW2d 321 (2009).

Here, the search warrant affidavit, authored by Detective Blair, averred that Lieutenant Lindsey informed Detective Blair that Dansard was in possession of cocaine that she had obtained from defendant, known to her as "Bay Bay." According to the affidavit, when Detective Blair interviewed Dansard, Dansard said that " 'Black' stated that he had arranged to purchase crack cocaine from 'Bay Bay.' " This is the only statement by Black included in the search warrant affidavit. Defendant contends that because Dansard did not see defendant sell any drugs to Black, any conclusion that the drugs found in Dansard's car came from defendant was speculative.

We conclude that the search warrant affidavit was sufficient for the magistrate to find probable cause to issue the search warrant. First, Dansard was a named informant. And it was clear that she spoke with personal knowledge of the information. MCL 780.653(a). As reflected in the search warrant affidavit, Dansard told Detective Blair that she drove Black to an address on Wood Street, that she gave Black money, that defendant opened the door of the home, that Black returned to the vehicle with crack cocaine, and that they did this five or six more times within the

---

The judge or district court magistrate's finding of reasonable or probable cause shall be based upon all the facts related within the affidavit made before him or her. The affidavit may be based upon information supplied to the complainant by a named or unnamed person if the affidavit contains 1 of the following:

(a) If the person is named, affirmative allegations from which the judge or district court magistrate may conclude that the person spoke with personal knowledge of the information.

(b) If the person is unnamed, affirmative allegations from which the judge or district magistrate may conclude that the person spoke with personal knowledge of the information and either that the unnamed person is credible or that the information is reliable.

same day. Detective Blair conducted an independent investigation to verify Dansard's information. Detective Blair and a Detective Galloro had Dansard locate the Wood Street home on Google maps and drove past it; Detective Blair showed Dansard an MDOC photograph of defendant, whom she identified as "Bay Bay"; Detective Blair confirmed that "Bay Bay" was one of defendant's aliases in a LEIN search; and Detective Blair confirmed that police had received tips in the past that defendant was selling drugs and that defendant had previous drug-related convictions. Thus, there was a substantial basis for the magistrate's determination that there was probable cause to issue the search warrant.

Defendant also argues that Detective Blair omitted from the search warrant affidavit that Dansard did not specifically witness the drug transaction between Black and defendant. In *Stumpf*, 196 Mich App at 224, this Court observed:

> *Franks v Delaware*, 438 US 154, 155-156; 98 S Ct 2674; 57 L Ed 2d 667 (1978), requires that if false statements are made in an affidavit in support of a search warrant, evidence obtained pursuant to the warrant must be suppressed if the false information was necessary to a finding of probable cause. In order to prevail on a motion to suppress the evidence obtained pursuant to a search warrant procured with alleged false information, the defendant must show by a preponderance of the evidence that the affiant had knowingly and intentionally, or with reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to a finding of probable cause. The rule from *Franks* has been extended to material omissions from affidavits. [Citations omitted.]

Dansard testified at the preliminary examination that she saw defendant answer the door of the Wood Street house and saw Black go inside, but she did not see anything else. She did not directly observe Black engaging in a drug transaction with defendant. Detective Blair testified at the preliminary examination that when he interviewed Dansard, she said that she did not witness the transaction. Detective Blair admitted that this information was not included in the affidavit and that "[i]n retrospect, yes, that should've been in there." But this admission of an omission does not rise to the level of a "material" omission. *Id*. It is important to keep in mind that the warrant concerned a search of the Wood Street property based on drug transactions at that location, and Dansard's information constituted evidence that drug transactions were indeed taking place at that home. Considering the facts and circumstances as Dansard provided along with the independent investigation the police conducted to corroborate Dansard's information, we agree that probable cause existed to issue the search warrant, regardless of the omission discussed above. Thus, the trial court did not err by denying defendant's motion to suppress.

## V. SUFFICIENCY OF THE EVIDENCE

Lastly, defendant argues that the evidence was insufficient to convict him of possession of crack cocaine weighing less than 25 grams because there was no direct evidence linking defendant to the coat where the drugs were found. We disagree.

In *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020), this Court set forth the well-established principles governing a sufficiency argument, observing as follows:

This Court reviews de novo whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [Quotation marks and citations omitted.]

Possession of a controlled substance requires a showing of "dominion or right of control over the drug with knowledge of its presence and its character." *People v Meshell*, 265 Mich App 616, 621; 696 NW2d 754 (2005) (quotation marks and citations omitted). "[P]ossession may be proved by circumstantial evidence and reasonable inferences drawn from this evidence." *People v Nunez*, 242 Mich App 610, 615; 619 NW2d 550 (2000) (quotation marks and citation omitted).

Although none of the officers who testified at trial could say how defendant came to be wearing a coat, or who gave defendant a coat, the evidence was sufficient to convict defendant of possession of a controlled substance with respect to the 6.719 grams of crack cocaine found in the pocket of the coat he was wearing during booking. MCL 333.7403(2)(a)(*v*). Bowling testified that he knew defendant to be a drug dealer and to typically have drugs on his person. Bowling also stated that he frequently drove defendant to the Wood Street address. On the day of the raid, during the drive to the house on Wood Street, Bowling saw a bag of drugs roll out of defendant's coat pocket. Once the raid began, Bowling observed defendant flush drugs down the toilet. When defendant was approached by Lieutenant Lindsey, defendant was seen chewing or swallowing something, signifying to Lieutenant Lindsey that he may have been trying to dispose of drugs. Defendant ran from Lieutenant Lindsey, struggled against the lieutenant, and was ultimately restrained. While defendant was handcuffed and sitting on the couch, he was seen leaning to one side in a strange posture. When defendant was transported to the jail, he again moved in an odd manner in the backseat of the cruiser and requested that the troopers roll down the window. Defendant was found to be in physical possession of the drugs during booking. Lieutenant Moore testified that he did not think that the coat defendant wore would have fit anyone else who was detained at the house—the two females were small, and the other two males were thin—whereas defendant was "stocky." A juror could reasonably infer from the circumstantial evidence discussed above that the jacket belonged to defendant and that defendant knowingly possessed the crack cocaine found in the coat. Accordingly, there was sufficient evidence to support the drug-possession conviction.

We affirm.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Brock A. Swartzle