*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 30, 2024

Plaintiff-Appellee,

v

No. 365485
Van Buren Circuit Court
LC No. 2022-023842-FH

RICARDO GARCIA-BADILLO,

Defendant-Appellant.

Before: MALDONADO, P.J., and PATEL and HOOD, JJ.

PER CURIAM.

Defendant appeals by right his bench trial convictions of two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c. Defendant was sentenced to serve 2 to 15 years' imprisonment for both counts of CSC-II, to be served concurrently. We affirm.

## I. BACKGROUND

This case stems from allegations made by AA, who was 11 years old at the time of trial, that defendant touched her genitals and breasts. Defendant was in a dating relationship with AA's mother, and he moved in with AA, AA's mother, and AA's brother approximately four months after the relationship began. AA described the incident as follows:

> So, I was laying down, sleeping, and it was a school night. And he came and woke me up and he said, "Scooch over," and I scooched over. And then, I—I thought he was going to like watch TV or something, but then he started laying right next to me, and then he said—he asked me, "Are you ticklish," and I said, "No," because I've never been ticklish all my life.
>
> And then he started tickling me. He started going under my shirt, and then into my pants, and he touched the side of my vagina. And then, that's when I scooched over a little bit, far away from him, and then he said, "Are you ticklish in the armpit," and I said, "No." And he went through my neck hole, and then he went through my bra, then he touched my left breast and he squeezed it. And then, he let go and he went and started tickling from my armpit.

-1-

AA clarified that defendant did not penetrate her vagina.

> Then, he said, "I have to go to work," and then I said, "Okay," and I said I had to go to the restroom. So, I was on my way, right next to the TV—I was right there, then he decided to pick me up and—he just started picking me up, and then he put me down, and then I went to the restroom, and that's when I started getting ready for school.

Defendant drove AA and her brother to school, and AA did not tell anybody what happened while she was at school. However, when she got home from school, AA told her mother, and her mother called 911. AA explained that she reported this because she had been taught both in school and by her relatives that being touched "in your private parts" is "not good" even if friends or family do it. AA then disclosed the abuse to a person at the hospital and then to her counselor.

At a later date, defendant was interviewed by a detective, through a Spanish interpreter, about the allegations. The video of the interview was played for the jury, and it was transcribed in the lower court record. Defendant initially stated that he had only tickled AA but he eventually admitted that he put his hand underneath her pants and touched her genital area. When asked about touching AA's breast, defendant initially maintained that he has only tickled AA's arm. However, when pressed, he admitted that he also touched her breast. Defendant denied penetrating AA's vagina and stated that he did not touch either body part for a long period of time.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel rendered ineffective assistance by failing to adequately impeach AA. We disagree.

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id*.

The Sixth Amendment of the United States Constitution guarantees that criminal defendants receive effective assistance of counsel. *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed2d 674 (1984). Michigan's Constitution affords this right the same level of protection as the United States Constitution. *People v Pickens*, 446 Mich 298, 318-320; 521 NW2d 797 (1994). Accordingly, "[t]o prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *Head*, 323 Mich App at 539 (quotation marks, citation, and alteration omitted). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). This Court presumes counsel was effective, and defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539.

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 US at 690. This Court then evaluates "whether the trial attorney's acts or omissions were outside the wide range of professionally competent assistance." *People v*

*Green*, 322 Mich App 676, 684; 913 NW2d 385 (2018) (quotation marks and citation omitted). "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019). However, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). The cross-examination of witnesses is a matter of trial strategy. *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). However, "[c]ounsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

AA offered testimony at both the trial and preliminary examination regarding videos she viewed on social media, prior to the incident at issue, about stepfathers inappropriately touching stepdaughters. At the preliminary examination, AA testified as follows:

> *Q*. Have you ever talked to your mom about maybe having [defendant] leave?
>
> *A*. Yes, I have tried because I have this feeling that something was going to go (inaudible). I had this like little something inside me that it was not going to be good and it was turn in wrong [sic] one day.
>
> *Q*. When you say something was going to turn wrong, are you talking about between [defendant] and your mom?
>
> *A*. Yeah, I thought they would break up or something and I got—I watched movies how long [sic] step-fathers touch their step-daughters. I was thinking of that but I did ask my ma, (inaudible) and one of my friends.
>
> * * *
>
> *Q*. But you never really stopped feeling uncomfortable around [defendant]?
>
> *A*. I would sometimes think that he would like touch me or something because I was always like, you know, would watch these movies and stuff but [sic] step-fathers touch their step-daughters and had that feeling.
>
> *Q*. When you say step-father touching you, could you be more specific? What did you see about step-fathers touching step-daughters?
>
> *A*. Like touching their inappropriate body parts.
>
> *Q*. Where did you see this?
>
> *A*. In some social media like Netflix or Tik Tok or something like that.
>
> *Q*. So when [defendant] moved in, and I understand that you're uncomfortable with him being there, but you were looking at just social media sites to see how step-fathers shouldn't touch daughters?

*A.* Yeah.

The prosecutor followed up with AA regarding this topic during redirect examination:

*Q.* You also mentioned it was something kind of in the back of your head like you were worried that maybe something could happen to you.

*A.* Yes.

*Q.* Okay. And so you kind of researched this on line [sic] or what exactly led you to kind of look these things up on line? [sic]

*A.* I had heard my friend, it happened to her, she told me like how I got worried [sic] that he would do that too.

*Q.* Okay. So that's kind of what started making you be concerned, that it had happened to a friend.

*A.* Yes.

At the trial, AA was recalled by defense counsel and asked again about these videos she viewed.

*Q.* [P]rior to this incident happening with [defendant], okay, you were viewing some videos on TikTok, correct, or some form of social media, I believe you said?

*A.* Yes.

*Q.* And those videos were about inappropriate stepfathers, is that what they were?

*A.* Yes.

*Q.* But at that time, before [defendant] had—this incident had happened, these allegations came out, why—why were you looking at those videos?

*A.* They—when I was scrolling, they would pop up.

*Q.* Oh, so it wasn't intentional? They just came up?

*A.* Yes.

*Q.* Oh, I see. And those—they were just—they just popped up and they were incidental videos about stepdads inappropriately touching, is that what you're saying?

*A.* Yes.

-4-

Defense counsel did not have any additional follow up questions, but the court then sought clarification:

> *The Court*. Okay. When was this? When were they popping up?

> *The Witness*. It was like before the incident happened.

> *The Court*. Okay. Would you have been looking at any similar type sites?

> *The Witness*. I—yes. It was like a video that showed that you shouldn't— if they touch you there, then it's not good.

> *The Court*. Okay. Do you know how—how much before this incident that was?

> *The Witness*. I don't know.

> *The Court*. Like, would it have been days, or weeks, or any idea—or months, or years?

> *The Witness*. I don't know.

> *The Court*. Okay. Okay. So, you—so you—you—were you looking at sites about stepfathers, what they could do, what type of touching was good and what was bad?

> *The Witness*. No. I would—I would always like scroll and then they would just—the video would just pop up.

> *The Court*. But what you would be scrolling through would be about something different?

> *The Witness*. Yes.

> *The Court*. Okay. Anything close to the same topic?

> *The Witness*. No.

Defendant asserts that AA testified at the preliminary examination that she went on the internet in order to research the ways in which stepparents might inappropriately touch stepchildren. This would be significant because AA did not make it a secret that she did not want defendant living in her home, and she admitted to having told her mother lies about defendant in the hopes that she would kick him out; one might infer that AA's true motive for looking up these videos was to create a persuasive story that would get defendant out of the house. If defendant's characterization of AA's prior testimony were accurate, then counsel's decision not to impeach AA's trial testimony with evidence of her preliminary examination testimony would be indefensible.

The problem with defendant's argument is that he paints AA's preliminary examination testimony as being clearer than it was. AA did not give direct answers to how she found the videos, and the quotes defendant provides were actually questions to which AA answered, "yes." In his brief, defendant asserted that AA "testified affirmatively that she had been 'looking at just social media sites to see how step-fathers shouldn't touch daughters,' despite not having had any inappropriate contact with [defendant] at this point." However, the quoted material is actually the attorney's question during this exchange:

> *Q.* So when [defendant] moved in, and I understand that you're uncomfortable with him being there, but you were looking at just social media sites to see how step-fathers shouldn't touch daughters?
>
> *A.* Yeah.

All AA said was "Yeah." She stated repeatedly that she did not want defendant at the home and that she had watched videos about how stepparents should not touch children; it's possible that she said "Yeah" to those parts of the question while not realizing that she implied that her purpose for visiting the sites was to seek out such videos. Therefore, it was reasonable to conclude that this snippet from the preliminary examination would not make for compelling impeachment when AA testified unambiguously at trial that she saw the videos incidentally.

Defendant also asserts that AA "said that she had 'kind of researched this' topic and 'looked these things up on line [sic]' because something similar had happened to her friend, and [AA] got worried that [defendant] 'would do that too.' " Again, this quote is largely drawn from the attorney's question:

> *Q.* Okay. And so you kind of researched this on line [sic] or what exactly led you to kind of look these things up on line? [sic]
>
> *A.* I had heard my friend, it happened to her, she told me like how I got worried [sic] that he would do that too.
>
> *Q.* Okay. So that's kind of what started making you be concerned, that it had happened to a friend.
>
> *A.* Yes.

This time, AA's answer was not entirely responsive to the attorney's question. When viewing exactly what AA said, a reasonable interpretation of her testimony was that she became fearful of defendant's intentions because her friend was abused by a stepparent and because she had stumbled upon pertinent videos online. Because of this ambiguity, this likewise would not have made for effective impeachment.

### III. HEARSAY

Defendant argues that the trial court erred by admitting testimony regarding statements defendant made to police because it was translated by AA's mother; therefore, according to defendant, it was inadmissible hearsay. Defendant also argues that defense counsel was ineffective by failing to object to the same. We disagree.

In general, evidentiary challenges are reviewed for abuse of discretion. *Thorpe*, 504 Mich at 251. "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls 'outside the range of principled outcomes. A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id.* at 251-252 (quotation marks and citation omitted). However, this issue is unpreserved, and unpreserved evidentiary challenges are reviewed for plain error, and a plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted). Even if the three requirements are met, "reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763 (quotation marks, citation, and alterations omitted).

Claims of ineffective assistance of counsel present mixed questions of fact and law. *Head*, 323 Mich App at 539. Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id*. Because the trial court has not conducted an evidentiary hearing, this Court should limit its review to mistakes that are apparent from the record. *Riley*, 468 Mich at 139. "The standards for 'plain error' review and ineffective assistance of counsel are distinct, and therefore, a defendant can obtain relief for ineffective assistance of counsel even if he or she cannot demonstrate plain error." *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020), citing *Randolph*, 502 Mich at 5.

Deputy Andrew Laylon testified that he responded to a call involving defendant and arrived to find AA, AA's mother, and AA's aunt crying in front of the house. After Deputy Laylon arrived, defendant arrived at the home as well and Deputy Laylon spoke with defendant.

*Q*. And what did he say?

*A*. He said he had woken [AA] up for school by nudging her and they had sat next to each other on the couch in the living room, and then she got up and got dressed after they spoke about waking up [AA]'s brother to go to school.

*Q*. Did he say how he woke her up?

*A*. I believe he said he nudged her in the arm and that was the only contact he had with her.

*Q*. And he said that was the only contact he had with her?

*A*. I believe so.

*Q*. And did you—you said he talked to her?

*A*. Yes.

*Q*. And what did he say he talked to her about?

-7-

*A*. He said they were just talking about waking up [AA]'s little brother to get ready for school.

* * *

*Q*. And so, what was the conversation between you and him about what happened that morning?

*A*. Just that he had nudged [AA] to wake her up, and that was the only contact he had had with her. And that he had laid down to go to bed as soon as [AA] got up and started getting ready for school, and then, heard [the brother]'s tablet going off, so he went to wake up [the brother] up. [sic] And then, saw that the bus hadn't come, so he'd given them a ride to school.

*Q*. And I just want to be clear, you said when he laid down, he said he laid down in his own bedroom.

*A*. Yes.

*Q*. And he said the only contact he had was tapping her on the arm to wake her up?

*A*. Correct.

Defendant asserts in his brief that this conversation was translated to the officer by AA's mother.

We decline to address the merits of whether defendant's statements to Deputy Laylon were admissible for three reasons. First, nothing he said to Deputy Laylon was incriminating; all he said was that he nudged AA to wake her up for school. Second, defendant has not even suggested that AA's mother did not properly interpret defendant's statements. While the standards are distinct, the ineffective and plain error tests both require some showing that the errors might have affected the trial's outcome. Assuming arguendo that these statements should not have been admitted, it is inconceivable that defendant's conviction was in any way predicated on evidence that he initially denied wrongdoing. This is especially true in light of the other evidence presented in the case. In particular, *defendant confessed*. Not only did he confess, but his confession was largely consistent with AA's version of events. Moreover, any argument that defendant was harmed by evidence that his initial statements were contradicted by subsequent statements is unavailing because he initially denied wrongdoing during his interview with the detective. Therefore, defendant has fallen far short of establishing prejudice. Finally, nothing in the record even supports defendant's assertion that defendant spoke to Deputy Laylon through AA's mother; Deputy Laylon made no references to an interpreter during his testimony.

Defendant acknowledges that "this was not explicitly stated at trial," but he states that it was noted in a police incident report that was appended to his brief. However, parties may not expand the record on appeal. *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). Therefore, this issue can be easily resolved without addressing the admissibility of the statement.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Sima G. Patel
/s/ Noah P. Hood